# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 92-CV-1002 (JFB) (CLP)

_____

GERALDINE BOYLAND, JOAN AND ROBERT FORD, AND PHILLIS SCIRICA, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

BRIAN J. WING, AS COMMISSIONER OF THE OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE OF THE NEW YORK STATE DEPARTMENT OF FAMILY ASSISTANCE, AND JASON A. TURNER, AS COMMISSIONER OF THE NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES,

Defendants.

_____

MEMORANDUM AND ORDER
March 27, 2007

_____

JOSEPH F. BIANCO, District Judge:

Plaintiffs Geraldine Boyland, Joan and Robert Ford, and Phillis Scirica bring this class action on behalf of themselves and other similarly situated New York City residents who sought the assistance of the New York City Department of Social Services ("DSS" or the "City") or one of its agents to resolve a heat-related energy emergency at any time since February 27, 1989 and (1) were not provided with an emergency benefit under the Home Energy Assistance Program ("E-HEAP"") due to the failure of DSS or its agents to inform them of the availability of such benefits, or (2) did not receive timely notice of an E-HEAP eligibility determination or some form of assistance to resolve the energy emergency within forty-eight hours of

the resident's request, or within eighteen hours if under life-threatening circumstances, or (3) received a state-funded loan pursuant to New York Social Services Law § 131-s to resolve the heat-related energy crisis without evaluation of eligibility for an E-HEAP benefit, and were compelled to repay such state funds. Plaintiffs allege past and present violations of their due process rights, and of federal and state law by the City and the Office of Temporary and Disability Assistance of the New York State Department of Family Assistance (the "State") (collectively, "defendants"), as a result of defendants' policies and practices relating to E-HEAP. The central issues in this case are whether (1) the federal E-HEAP statute creates rights that are enforceable under 42 U.S.C. § 1983, (2) defendants currently

employ constitutionally inadequate procedures in administering E-HEAP that warrant prospective relief under the Due Process Clause and (3) the Eleventh Amendment of the Constitution bars the retroactive relief for due process violations sought by plaintiffs.

Plaintiffs now move for summary judgment on their claims. Defendants oppose plaintiffs' motion and cross-move for summary judgment as to all of plaintiffs' claims. For the reasons set forth below, the Court concludes: (1) the federal E-HEAP statute does not create a private right of action; (2) the current procedures employed by defendants in administering E-HEAP are constitutionally adequate and no continuing due process violation exists warranting prospective relief; and (3) any retroactive relief for past due process violations relating to E-HEAP are barred by the Eleventh Amendment. Thus, plaintiffs' motion is denied, defendants' cross-motion is granted, and plaintiffs' claims are dismissed.

I. BACKGROUND

A. Facts

A related case addressing non-emergency, or "regular," HEAP benefits was initiated in 1998, and involved the same defendants and many members of the plaintiff class in this case. The regular HEAP case was resolved by a decision by the Honorable Nina Gershon, which was affirmed in part and vacated in part by the Second Circuit Court of Appeals. *See Kapps v. Wing*, 283 F. Supp. 2d 866 (E.D.N.Y. 2003) (Gershon, J.), *aff'd in part, vacated in part*, 404 F.3d 105 (2d Cir. 2005). The two published decisions in the regular HEAP case each provide a detailed summary of the HEAP program, including descriptions of the federal statute that established the HEAP program, the Low-Income Home Energy Assistance Act ("LIHEAA"), New York State law pertaining to HEAP, and the procedures employed by defendants for distributing regular HEAP benefits.

Moreover, in a Memorandum and Order issued in this action on April 6, 2001, the Honorable David G. Trager certified the plaintiff class and provided an extensive summary of the statutory framework governing the distribution of E-HEAP benefits. *See Boyland v. Wing*, No. 92 Civ. 1002 (DGT), 2001 WL 761180 (E.D.N.Y. April 6, 2001). Thus, based on the extensive attention courts have devoted to this action and to the HEAP program in general, this Court assumes the parties' familiarity with the facts and background of this case and, in particular, with the statutory framework governing the distribution of HEAP and E-HEAP benefits in New York City.

B. Procedural History

The original complaint in this action was filed in March 1992. Plaintiffs filed an amended complaint on February 8, 2000. Plaintiffs moved for summary judgment on January 19, 2004. The City defendant cross-moved for summary judgment on February 3, 2004. The State filed a cross-motion for summary judgment on September 19, 2003.

On September 30, 2004, Judge Trager granted the parties' request to hold the motion and cross-motions in abeyance pending the Second Circuit's decision in *Kapps*. The Second Circuit issued its decision on April 4, 2005. Subsequently, on February 1, 2006, the case was reassigned to this Court. The Court heard argument on the pending motion and cross-motions on April 21, 2006. Thereafter,

the parties submitted additional briefs to the Court regarding the pending motions. The final supplemental brief was submitted to the Court on March 14, 2007.

II. MOTIONS FOR SUMMARY JUDGMENT

A. Summary Judgment Standard

The standards for summary judgment are well settled. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

At the summary judgment stage, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As the Supreme Court stated in *Anderson*, "[i]f the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

## B. Standing

Defendants[1] argue that, because the named plaintiffs have not sought E-HEAP benefits during the past three years, plaintiffs lack standing or, in the alternative, that the named plaintiffs are no longer adequate representatives of the plaintiff class. (*See* City Dft.'s Ltr. dated Aug. 11, 2006; City Dft.'s Ltr. dated July 21, 2006.) For the reasons that follow, the Court finds that the named plaintiffs have standing and that the named plaintiffs remain adequate representatives of the plaintiff class.

Under Article III, standing to bring suit in federal court is limited to a plaintiff who can "show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004); *see also Ziemba v. Rell*, 409 F.3d 553, 555 (2d Cir. 2005). Further, among other standing requirements, "a plaintiff's alleged injury must be an invasion of a concrete and particularized legally protected interest." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 107 (2003); *see also Ziemba*, 409 F.3d at 554.

In this case, the Court finds that the named plaintiffs have standing. Plaintiffs Geraldine Boyland, Robert and Joan Ford, and Phyllis Scirica argue that they were denied E-HEAP benefits without constitutionally adequate process. (*See* Pls.' 56.1 ¶¶ 143-256.) Since the commencement of this action, no "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation" – that is, the named plaintiffs have not received compensation for the allegedly improper denial of benefits. *Paciello v. Unum Life Ins. Co. of America*, 188 F.R.D. 201, 204 (S.D.N.Y. 1999) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). As such, the claims of the named plaintiffs continue to present a "live controversy" within the meaning of Article III. *Lillbask ex rel. Mauclair v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) ("'[A]t all times, the dispute before the court must be real and live, not feigned, academic, or conjectural.'") (quoting *Russman v. Board of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001)). Accordingly, the Court "declines to require plaintiffs' counsel to name a new class representative, despite [counsel's] expressed readiness to do so." *Hargrave v. Vermont*, 340 F.3d 27, 34 n.6 (2d Cir. 2003).

Moreover, even assuming *arguendo* that the named plaintiffs' claims have become

---

[1]Although the City and State defendants, in their respective moving papers, have raised somewhat different arguments regarding these motions, the Court refers to their arguments collectively as "defendants' arguments."

moot, the Court finds that the plaintiff class retains standing. The Second Circuit has found that "special standing rules exist for class representatives." *Martens v. Thomann*, 273 F.3d 159, 173 (2d Cir. 2001). One such rule provides that "class representatives may continue to represent a class even if their individual claims become moot." *Id.*; *see, e.g., United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980) ("[A]n action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim."); *Sosna v. Iowa*, 419 U.S. 393, 402 (1975) ("The [live] controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot."); *Hargrave*, 340 F.3d at 34 n.6 (noting that the mooting of the named plaintiff's claim "does not affect the validity of class certification or raise any question as to the existence of a valid controversy with respect to the unnamed class members"); *see also Paciello*, 188 F.R.D. at 205 ("[T]he Second Circuit has warned district courts not to provide defendants with an incentive to give priority treatment to putative class representatives in the hope of mooting their claims and thereby eliminating the class action.").

In addition, it is well settled that a named plaintiff whose individual claim is mooted may remain an adequate class representative under Rule 23 of the Federal Rules of Civil Procedure. *Hargrave*, 340 F.3d at 34 n.6; *Comer v. Cisneros*, 37 F.3d 775, 798 ( 2d Cir. 1994) ("'In class actions . . . courts have come to recognize that an individual plaintiff may continue to represent the interests of others even after any prospect of individual recovery has vanished.'") (quoting 13A Charles A. Wright, et al., *Federal Practice and Procedure* § 3533.9, at 391); *see also Torres v. N.Y. State Dep't of Labor*, 318 F. Supp. 1313, 1317-18 (S.D.N.Y. 1970). Accordingly, even assuming *arguendo* that the named plaintiffs' individual claims have become moot, the Court finds that the plaintiff class has standing and that the named plaintiffs may continue to represent the plaintiff class.

## C. LIHEAA Claims

Plaintiffs argue that Section 8624(b)(13) of LIHEAA creates rights that are enforceable under 42 U.S.C. § 1983. In *Kapps*, 404 F.3d at 126-127, the Second Circuit expressly declined to address this specific issue and, after affirming the finding of a due process violation, vacated the lower court's alternate holding that a private right of action existed under Section 8624(b)(13). The Second Circuit vacated that portion of the judgment "without prejudice to the plaintiffs raising § 8624(b)(13) before the district court in the future, should it become apparent that the due process basis for the injunction is inadequate to afford the plaintiffs full relief." *Id.* at 105. Plaintiffs in the instant case assert that such a day has arrived. For the reasons set forth below, and assuming *arguendo* that the Eleventh Amendment does not foreclose the relief sought by plaintiffs, the Court finds that there is nothing in the language or the structure of LIHEAA that would demonstrate that Congress was unambiguously conferring a right that could support an action under Section 1983 and, thus, no such cause of action exists.

Section 1983 provides a private cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. As the Supreme Court has noted, "Section 1983 'is not itself a source of

substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *accord Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). Therefore, to prevail on a claim under Section 1983, a plaintiff "must assert the violation of a federal *right*, not merely the violation of a federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (emphasis in original).

In *Blessing*, the Court held that, in determining whether a federal statute creates a federal right enforceable through a Section 1983 action, three factors should be considered: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States." 520 U.S. at 340-41.

In *Gonzaga University v. Doe*, 536 U.S. 273 (2002), the Supreme Court recognized that its previous decisions applying Section 1983 to spending clause legislation were not "models of clarity" and, thus, used the *Gonzaga* case to "resolve any ambiguity" in this area. *Id.* at 278. In particular, the Court reiterated that "'[i]n legislation enacted pursuant to the spending power, the typical remedy for State noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the federal government to terminate funds to the State.'" *Id.* at 280 (quoting *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)). The Court noted that, since 1981, it had only twice

found spending legislation to confer enforceable rights. *Id.*

Concerned that some courts had interpreted *Blessing* "as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect," the *Gonzaga* Court made clear that it "reject[s] the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283; *see also Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 783 (2d Cir. 2002) (the inquiry is whether "the statutory language 'unambiguously confers an enforceable right' upon an identifiable class of beneficiaries") (citation omitted). Without such "specific, individually enforceable rights, there [is] no basis for private enforcement, even by a class of the statute's principal beneficiaries." *Id.* at 280 (citing *Suter v. Artist M.*, 503 U.S. 347 (1992)). Thus, the Court concluded, "[i]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms." *Id.* at 290.

The district court in *Kapps* found that Section 8624(b)(13) created a private right of action under Section 1983. On appeal, the Second Circuit affirmed the court's finding that the defendants had violated due process in the administration of the HEAP program, but refused to address the court's alternate holding that LIHEAA creates individually enforceable rights. The Second Circuit noted:

> The question of whether § 8624(b)(13) of the LIHEAA creates rights that are enforceable under § 1983 is not an easy one. On the one hand, as the plaintiffs point out, § 8624(b)(13) has many of the

characteristics that the Supreme Court has identified as important to the creation of privately enforceable statutory rights. . . . On the other hand, the Court has appeared to be increasingly reluctant to find § 1983-enforceable rights in statutes which, like the LIHEAA, set forth their requirements in the context of delineating the obligations that accompany participation in federal spending clause programs. . . . In the aftermath of the Court's decision in *Gonzaga University*, our circuit has not yet established a unified approach to provisions contained in spending clause statutes such as the LIHEAA. . . . Given the difficulty of the question, and the fact that the district court's ruling on the LIHEAA/§ 1983 issue was not necessary to its grant of injunctive relief, we decline to decide at this time whether § 8524(b)(13) creates privately enforceable rights.

*Id.* at 127. Thus, the Court vacated the portion of the district court's opinion finding that Section 8624(b)(13) created a private right of action that is enforceable under Section 1983. *Id.*

Two of the three circuits that have addressed this issue, even prior to the Supreme Court's clarification in *Gonzaga*, have found that LIHEAA conferred no rights upon which a Section 1983 action could be based. *See Cabinet for Human Res., Com. Ky. v. Northern Ky. Welfare Rights Ass'n*, 954 F.2d 1179, 1186 (6th Cir. 1992) ("[P]laintiffs cannot sustain a private right of action under § 1983."); *Hunt v. Robeson County Dep't of Soc. Servs.*, 816 F.2d 150 (4th Cir. 1987) (same); *but see Crawford v. Janklow*, 710 F.2d 1321 (8th Cir. 1983) (finding that

LIHEAA creates substantive rights enforceable under Section 1983).

In *Hunt*, the Fourth Circuit upheld the lower court's holding that LIHEAA does not create enforceable rights under Section 1983. In reaching that decision, the Fourth Circuit emphasized that "plaintiffs have not pointed to any substantive provision of LIHEAA that gives them a tangible right, privilege or immunity." 816 F.2d at 152. More specifically, the court noted:

[LIHEAA] is a mere federal-state funding statute, which gives actual assistance to the States and only indirect benefits to qualified households. The Act's language and structure demonstrate this. Section 8621(a), the general purpose section, provides that the Secretary is authorized "to make grants, in accordance with the provisions of this subchapter, to States to assist eligible households to meet the costs of home energy." Nothing in any of [LIHEAA]'s provisions can be said to intend the creation of the kind of rights to which a remedy in favor of persons such as the plaintiffs could attach.

*Id.* at 153.

In *Cabinet for Human Resources*, the Sixth Circuit agreed with *Hunt* and found that LIHEAA conferred no rights that could form the basis for a Section 1983 action. In particular, the court noted that "[t]he language of the Act is contractual in tone and correspondingly suggests a contractual type relationship between the state and the federal government." 954 F.2d at 1186. The court, however, further explained that "[a]lthough

the claimants may benefit from the federal-state relationship, the statute does not necessarily confer substantive rights as a result." *Id.* The court then concluded that "this is a situation in which Congress is suggesting instead of mandating," and, thus, found "that the Association has no private right of action under § 1983." *Id.*

This Court finds the analyses in *Hunt* and *Cabinet for Human Resources* to be persuasive. There are a number of characteristics to LIHEAA that provide strong support for the conclusion that Congress did not intend to confer Section 1983-enforceable rights in the statute. First, the program set forth in LIHEAA is completely voluntary. In other words, states are not required to participate in the program and can choose to forego the benefits in their entirety. The voluntary nature of the program is further illustrated by the fact that the primary method for penalizing noncompliance with the provisions of the Act is for the Secretary to withhold funds from the participating state. *See* 42 U.S.C. § 8627.

Second, LIHEAA does not establish an entitlement program. Under LIHEAA, participating states receive a lump sum to be distributed to eligible households and, although the statute establishes a minimum eligibility scheme, it does not prescribe a method of calculating actual benefits to be distributed among eligible households. Thus, states have broad latitude in determining which of the eligible households will receive a portion of the available funds and how much each household should receive. This latitude is illustrated by the provision that directs participating states to set aside "a reasonable amount" of grant funds for energy crisis intervention. *See* 42 U.S.C. § 8623(c). Under this scheme, a state could set aside its entire

allotment for energy crisis intervention and not offer any subsidies in any form. As the Sixth Circuit noted in *Cabinet for Human Resources*, "[LIHEAA] does not create an entitlement program; a state may exhaust its funds before some of its neediest families receive any benefit at all, yet this clearly would not constitute a violation of the statute." 954 F.2d at 1182. Moreover, "[u]nlike entitlement programs, once the sum is depleted no more subsidies will be awarded regardless of an applicant's eligibility or need." *Id.* at 1180.

Third, although a state must submit a plan to the Secretary detailing how the state will distribute grant funds, LIHEAA simply does not contain the type of mandatory "rights-creating" language that Congress utilizes when it is seeking to dictate certain conduct. LIHEAA does not contain the customary "shall" language utilized when Congress is imposing mandatory obligations and evincing an intent to create new rights; instead, the Act provides that the participating state "give assurances" that the state will meet the established conditions and the chief executive officer of the state will "certify that the State agrees to" the conditions. 42 U.S.C. § 8624(a)-(b).

Fourth, LIHEAA is replete with other language demonstrating that Congress wanted there to be a limited federal role in the administration of the energy subsidy program set forth in the statute. The administration of the program is left almost entirely to the discretion of the state. In fact, LIHEAA explicitly limits the Secretary's authority to dictate how a state complies with the statute. *See* 42 U.S.C. § 8624(b) (the "Secretary may not prescribe the manner in which the States will comply" with the central, substantive provisions of the Act). Moreover, LIHEAA

also makes clear that it is the responsibility of the state to conduct "a fair administrative hearing" when a claim is denied or is not acted upon promptly. 42 U.S.C. § 8624(b)(13). However, LIHEAA does not leave enforcement entirely to the state. It allows claimants to complain directly to the Secretary about noncompliance with the statute, and the Secretary can withhold funds from a state in the case of noncompliance (*See* 42 U.S.C. § 8627). Moreover, if the Secretary determines that the nondiscrimination provisions of LIHEAA have been violated by a state, the Secretary may refer the matter to the Attorney General and recommend the initiation of a civil suit. *See* 42 U.S.C. § 8625. Therefore, although Congress clearly intended to leave primary review of denial of claims to the state, it is not the case that an aggrieved individual lacks any federal review mechanism.

The statutory scheme in the instant case is similar in many key respects to the one addressed by the Supreme Court in *Pennhurst.* The *Pennhurst* case dealt with the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act ("Disabled Assistance Act") which, like the LIHEAA, was (1) a voluntary federal-state cooperative program under which the state either complied with the conditions of the program or would forego the benefits of federal funding, and (2) used non-mandatory language instructing each state to "provide the Secretary satisfactory assurances" that certain steps would be taken to protect the interests of the state's developmentally disabled population. *Pennhurst*, 451 U.S. at 11-13. Based on this language and structure, the *Pennhurst* Court held that the Disabled Assistance Act did not create substantive rights in favor of the mentally retarded that were enforceable under Section 1983. The

Court explained, "Congress . . . plainly [understands] the difference, financial and otherwise, between encouraging a specified type of treatment and mandating it." *Id*. at 27. Thus, *Pennhurst* provides further support for the conclusion that the language and structure of LIHEAA does not confer enforceable rights in clear and unambiguous terms. *See Hunt*, 816 F.2d at 153 ("If anything, the 'rights' claimed in *Pennhurst* were more definite than those claimed [under LIHEAA].").

Moreover, the statutory scheme in the instant case is readily distinguishable from Section 1396r-6 of the Medicaid Act which the Second Circuit, in *Rabin v. Wilson-Coker*, 362 F.3d 190, 202 (2d Cir. 2004), found created enforceable rights under Section 1983. First, unlike LIHEAA, Section 1396r-6 focused directly on individual entitlements and required that each family that received money under the relevant Medicaid program remain eligible for assistance during the immediately succeeding six-month period.[2] *Id*. at 201. This is in stark contrast to LIHEAA which, as noted *supra*, is not an absolute entitlement program – that is, it does not guarantee or mandate benefits to any individuals or group of individuals. Second, although eligible persons under Section 1396r-6 received aid through a State plan (rather than direct assistance), Congress

---

[2] Subsection (a) of Section 1396r-6 provides:

[E]ach State plan approved under this subchapter must provide that each family which was receiving [AFDC] in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for such aid, because of . . . income from employment . . . remain eligible for assistance under the plan . . . during the immediately succeeding 6-month period.

explicitly provided that "[i]n an action brought to enforce a provision of this chapter [which includes the Medicaid statutes], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a-2. This provision was inserted in the statute to overrule *Suter v. Artist M.*, 503 U.S. 347, 358-59 (1992), in which the Supreme Court held a provision of the Adoption Act to be enforceable by a private individual because the applicable provision was administered through a state plan. Therefore, unlike LIHEAA, the language of the statute in *Rabin* clearly reflects Congress's intent to confer a right upon eligible persons. The statute in *Rabin* is further evidence that Congress, when it wants to confer an enforceable right, knows what language to use – something Congress did not do with respect to LIHEAA.

In sum, this Court concludes that there is nothing in the language or the structure of LIHEAA that unambiguously confers a private right enforceable in an action under Section 1983 and, therefore, no such cause of action exists.

### D. Due Process Claims for Prospective Relief

Plaintiffs also assert that defendants' conduct in administering the E-HEAP program continues to violate the procedural requirements of the Due Process Clause of the Fourteenth Amendment and, therefore, that plaintiffs are entitled to prospective relief in the form of an injunction directing defendants to modify the City's procedures for administering E-HEAP so as to comply with the Due Process Clause. However, for the reasons that follow, the Court finds that,

although plaintiffs have a property interest in receiving E-HEAP benefits, the existing E-HEAP procedures are constitutionally adequate and plaintiffs have failed to raise a genuine issue of disputed fact as to the implementation or execution of thos procedures.[3] As such, because this Court finds that defendants are not engaged in a continuing violation of federal law, there is no unlawful conduct to enjoin. *See, e.g., Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000).

In considering a due process claim, the court considers "two distinct issues: (1) whether plaintiffs possess a liberty or property interest protected by the Due Process Clause; and, if so, (2) whether existing state procedures are constitutionally adequate." *Kapps*, 404 F.3d at 112.

### 1. Property Interest

In *Kapps*, the Second Circuit carefully examined the regular HEAP program, and concluded that LIHEAA and New York State law conferred "a constitutionally protected property right . . . in the receipt of HEAP benefits." 404 F.3d at 112; *see Kapps*, 283 F. Supp. 2d at 878 (finding that plaintiffs have a

---

[3] In addressing the due process claim alleging a continuing violation, the Court has fully reviewed the record and relied upon, among other things, the affidavits, declarations and other exhibits, including Policy Directives, submitted by defendants regarding their current practices and procedures as it relates to E-HEAP benefits. As discussed below, nothing submitted by plaintiffs undermines those factual submissions in any respect. In other words, even drawing all inferences in plaintiffs' favor, they have failed to raise a disputed issue of material fact as tot the current E-HEAP procedures being executed by the defendnats. Thus, the legal issue – namely, whether the current procedures are constitutionally adequate – is ripe for summary judgment.

constitutionally protected property interest in HEAP benefits). The question here is whether the same analysis applies to *E-HEAP* benefits. After carefully reviewing the provisions of LIHEAA and New York law that govern the distribution of E-HEAP benefits, this Court finds that the Second Circuit's decision in *Kapps* must control the outcome of the property interest inquiry in this case. Thus, for the reasons set forth below, the Court finds that plaintiffs have a constitutionally protected property interest in E-HEAP benefits.

Here, as in *Kapp*, the Court finds that LIHEAA does not, by itself, create a protected property interest in E-HEAP benefits. *See* 42 U.S.C. § 8623(c) (states participating in the HEAP program "shall" reserve a "reasonable amount" of program funds for "energy crisis intervention"); *Kapps*, 404 F.3d at 113 ("LIHEAA itself cannot be considered to 'channel' official discretion sufficiently 'meaningfully' so as to confer a due process protected property right."). However, also as in *Kapp*, the Court finds that New York law "provides precisely the type of discretion-limiting substantive predicates" that limit the decision-making of E-HEAP administrators and "that are the hallmarks of protected property rights." *Kapps*, 404 F.3d at 113; *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003) (finding that a property interest will be found to exist where statutes or regulations "meaningfully channel[] official discretion by mandating a defined administrative outcome").

In so ruling, the Court notes that many of the same statutes and regulations examined by the Second Circuit in *Kapps* also "mandat[e] a defined administrative outcome" with regard to the distribution of E-HEAP benefits. *Sealed*, 332 F.3d at 56. Most definitively, New York law provides that

Each social services districts *shall* be required . . . to participate in the federal low-income home energy assistance program [which necessarily includes E-HEAP] and to assist eligible households found in such districts to obtain low-income home-energy assistance. . . . [T]hose persons who qualify for low-income home energy assistance . . . *shall be certified* as eligible for and *entitled* to receive said home energy assistance.

N.Y. Soc. Serv. L. § 97(2) (emphasis added).

Moreover, New York law setting forth E-HEAP eligibility criteria specifically incorporates the "substantive predicates" that also constrain the exercise of official discretion as to the distribution of regular HEAP benefits. That is, in order to obtain E-HEAP benefits, a household must, in addition to meeting other objective criteria, be "financially eligible for the regular HEAP benefit." N.Y. Comp. Codes R. & Regs. tit. 18, § 393.4(d) (hereinafter "18 NYCRR 393.4(d)"). The "substantive predicates" for regular HEAP benefits were found by the Second Circuit in *Kapps* to set forth "fixed eligibility criteria" so as to establish a property interest in regular HEAP benefits. *See Kapps*, 404 F.3d at 114 ("Like other statutory frameworks that we have found to create property interests, New York state law sets fixed eligibility criteria for the receipt of HEAP benefits.") (citing NYCRR 393.4(c) (setting forth eligibility criteria for regular HEAP)). Because those same "substantive predicates" considered in *Kapps* also establish "fixed eligibility criteria" for E-HEAP benefits, the Court finds that "all of the factors considered by the state in assessing individual [E-HEAP] eligibility are objective, and as such are ones over which [E-HEAP]

administrators have no discretionary control."[4] *Kapps*, 404 F.3d at 114.

Defendants attempt to distinguish the instant case from *Kapps* and argue that the New York state regulation setting forth E-HEAP eligibility criteria confers sufficient "discretionary control" on state officials so that plaintiffs have a mere "unilateral expectation," rather than "a legitimate [claim of] entitlement" to E-HEAP benefits. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). In support, defendants contrast the permissive language of the regulation setting forth E-HEAP eligibility criteria with the mandatory language of the analogous regular HEAP regulation. *Compare* 18 NYCRR 393.4(d)(1) ("[E]mergency benefits *may* be provided under this subdivision when a household [meets certain eligibility criteria].") (emphasis added) *and* 18 NYCRR 393.4(d)(2) ("a household *may* be eligible for one or all of the following emergency benefits") *with* 18 NYCRR 393.4(c) ("[T]he following households *shall* be eligible to receive a regular HEAP benefit.") (emphases added).

The Court rejects defendants' argument. Other than the provisions identified by defendants, the E-HEAP statutory framework is marked by language that narrowly channels official discretion in distributing E-HEAP benefits and mandates that eligible households receive E-HEAP benefits. *See, e.g.,* N.Y. Soc. Serv. L § 97(2) ("[T]hose persons who qualify for low-income home energy assistance . . . *shall be* certified as eligible for and entitled to receive said home energy assistance.") (emphasis added); 18 NYCRR 393.5(a) ("Some form of assistance to resolve the energy crisis *must be provided* to an eligible household in a life-threatening situation.") (emphasis added). Defendants do not, and cannot, point to any further evidence suggesting that the distribution of E-HEAP benefits is left to the discretion of state or city officials.

Thus, the Court finds that the precatory language found in 18 NYCRR 393.4(d) merely reflects that E-HEAP benefits are designed to address *emergencies*, and thus may be conferred on applicants more than once in a given HEAP program year. *See* 18 NYCRR 393.4(d)(2) ("[A] household may be eligible for *one or all* of the following emergency benefits.") (emphasis added). Households apply for E-HEAP benefits when, and if, they experience an "energy crisis." 18 NYCRR 393.5(a). Subsequently, contingent upon the household's eligibility and the availability of federal funding, the household receives sufficient E-HEAP benefits to address the *specific* crisis for which benefits were sought, and the same household may later apply, and perhaps receive, more E-HEAP benefits if another crisis arises. By contrast, a household applies for regular HEAP benefits only once during a given program year. *See* 18 NYCRR 393.3(b). Subsequently, contingent upon the

---

[4] For the same reasons set forth by the Second Circuit in *Kapps*, the Court also rejects defendants' arguments that plaintiffs' interest in E-HEAP is too tenuous to be constitutionally protected based on (1) plaintiffs' status as *applicants* for benefits, rather than current recipients, and (2) the fact that E-HEAP benefits are contingent on the non-exhaustion of federal funds. *See Kapps*, 404 F.3d at 115-18. In rejecting the first argument, the Second Circuit noted that "the aim of proper procedures is precisely to allow the state to decide *properly* whether the applicant in fact has a legitimate claim of entitlement." *Id.* at 116 (emphasis in original). As to the second argument, the Second Circuit has concluded that "plaintiffs' claim of entitlement – while funds remain available – is the same as it would be were the program not contingent on the availability of sufficient funds." *Id.* at 118.

household's eligibility and the availability of funding, the household receives a regular HEAP benefit to assist with home energy costs during that program year. 18 NYCRR 393.2(a)(3). Accordingly, the Court finds that the precatory language in the E-HEAP regulation merely reflects the uncertain number of E-HEAP benefits that may be allocated in a given program year, and does not undermine the otherwise overwhelming evidence that New York law vests plaintiffs with a protected property interest in the receipt of E-HEAP benefits.

### 2. Due Process

Next, the Court must determine "what process plaintiffs were due before they could be deprived" of their interest in E-HEAP benefits. *Kapps*, 404 F.3d at 118 (quoting *Sealed*, 332 F.3d at 55). Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Court must balance the following factors in evaluating the adequacy of a challenged procedure:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 167-68 (2d Cir.2001) (quoting *Mathews*, 424 U.S. at 335) (quotations omitted). As set forth below, pursuant to the Supreme Court's *Mathews v. Eldridge* test, this Court concludes that the process due to applicants for E-HEAP benefits is notice of the reasons for the

eligibility determination, and an opportunity to be heard in response. *See Kapps*, 404 F.3d at 118. Moreover, the Court finds that defendants' existing procedures do not violate plaintiffs' due process rights, and thus grants defendants' motion for summary judgment as to the due process claims.

### a. Private Interest

The private interest in this case is even more significant than the "high" private interest in regular HEAP benefits found by the Second Circuit in *Kapps*. *See Kapps*, 404 F.3d at 118. As the Second Circuit observed, "'[u]tility service is a necessity of modern life. . . . [T]he discontinuance of water or heating for even short periods of time may threaten health and safety.' The gravity of the health risks posed by a discontinuation of heating services is even greater for many HEAP recipients than for the general public, as the program specifically targets households which include potentially frail individuals." 404 F.3d at 118 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18 (1978)). In this case, the erroneous denial of E-HEAP benefits to eligible recipients is nearly certain to pose an even greater risk to "the impoverished families [E-HEAP] is intended to benefit." *See Kapps*, 283 F. Supp. 2d at 875. Households seek E-HEAP benefits during times of crisis, making it even more likely that, following the erroneous denial of E-HEAP benefits, households will not have the time or the means to avoid discontinuation of heating services. As such, the Court finds that plaintiffs' interest in not being erroneously denied E-HEAP benefits during an energy crisis is substantial. *See id.* at 119.

### b. Risk of Erroneous Deprivation

It is undisputed that, in the fourteen years since this case was filed, and with increasing

13

frequency following the Second Circuit's decision in *Kapps*, defendants have significantly modified their practices with regard to processing applications for E-HEAP grants, and thus have remedied many of the procedural deficiencies that plaintiffs originally identified as violating plaintiffs' rights. (*See* Transcript of April 21, 2006 proceeding (hereinafter, "Tr.") at 6-9.) In particular, the City has issued several "Policy Directives" instituting new procedures and has implemented the "Paperless Office System" ("POS") – a computer program used by City workers to conduct interviews of individuals seeking public benefits – to address the alleged deficiencies originally raised by plaintiffs.

At this time, however, plaintiffs contend that the modifications made by defendants have failed to address two deficiencies of the E-HEAP program arising from the process by which Job Centers[5] make initial determinations regarding an applicant's E-HEAP eligibility. Moreover, plaintiffs argue that the State defendant's "tolerance" of such deficiencies violates plaintiffs' rights. (Am. Compl. ¶ 181.) For the reasons that follow, the Court finds that the risk of erroneous deprivation of E-HEAP benefits is extremely low and insubstantial. *See R.G. Group*, 751 F.2d at 77.

(i) The Notice Issue

Plaintiffs argue that a single "notice issue . . . remains" in this case. (*See* Tr. at 6.) According to plaintiffs, Job Centers operated by the City fail to provide written notice of adverse E-HEAP eligibility determinations to applicants who are not referred to HEAP Central for an E-HEAP eligibility determination. Plaintiffs argue that this practice constitutes a continuing violation of plaintiffs' due process rights.

Defendants have presented overwhelming and uncontradicted evidence demonstrating that the City's current procedures ensure that applications for emergency energy assistance are forwarded to HEAP Central, which then provides notice of adverse E-HEAP eligibility determinations. Thus, the Court finds that the risk of erroneous deprivation from current E-HEAP notice procedures is extremely low and insubstantial.

First, the City defendant has issued Policy Directives that directly address the "notice issue" identified by plaintiffs. Policy Directives #06-32-ELI, dated November 28, 2006, and #06-06-ELI, dated April 4, 2006, contain the same directives regarding the requirement that Job Center workers forward applications for emergency energy assistance to HEAP Central.[6] Each Policy Directive provides that:

> The Job Center administration is responsible for ensuring that any person requesting a grant for a heat or heat-related emergency is assessed for HEAP eligibility. . . . Once the request is received, it must be forwarded to the [Job Center's] Utility Liaison. . . . The Utility Liaison will contact HEAP [Central] to initiate an Emergency HEAP application.

---

[5] "Job Centers" are public assistance offices operated by the City defendant wherein individuals seek emergency energy assistance or other forms of public benefits.

[6] Job Center workers receive training on the information contained in these Policy Directives in the month following their publication. (Fitzpatrick Decl., ¶ 6.)

(Fitzpatrick Decl., Ex. A; City Dft.'s Aug. 11, 2006 Ltr., Ex. A.)

Second, the City defendant has presented uncontradicted evidence that Job Centers do "not make the determinations as to the HEAP/E-HEAP eligibility of a client." (Shephard Aff. II, ¶ 15.) The procedures followed by the City defendant now require that, whenever a Job Center worker interviews an applicant for emergency energy assistance, the Job Center worker must complete and print a form containing the information relevant to the applicant's request for energy assistance (known as a "M-858m" form), and forward that form to HEAP Central. Specifically, the POS computer program[7] now automatically completes the relevant portions of the M-858m form whenever an applicant provides some indication that he or she is facing a heating emergency, such as if he or she is in "heat related arrears." (Shephard Aff. II, ¶¶ 9. 12-14; Exs. C-D.) If the Job Center worker fails to print the form, the POS program will stop and display an error message indicating that the Job Center worker "must print the M-858m form and forward it to the Utility Liaison OR you must scan and index the completed paper M-858m form."[8] (Id., Ex. D.)

Third, the City has presented uncontradicted evidence that its current procedures require that, upon receipt of an M-858m form, the Utility Liaison must forward the form to HEAP Central. As discussed *supra*, the City has presented Policy Directives which mandate that "[t]he Utility Liaison will contact HEAP [Central] to initiate an Emergency HEAP application." (Fitzpatrick Decl., Ex. A; City Dft.'s Aug. 11, 2006 Ltr., Ex. A.) In addition, the City has presented affidavits from administrators of the City's E-HEAP program stating that, "[c]urrently, the utility liaison is required to fax the M-858m form to HEAP Central" (Shepard Decl. II, ¶ 15), and that "it is HEAP Central, rather than the Job Centers, which make[] determinations of E-HEAP eligibility" (Evans Aff., ¶ 30).[9]

Finally, it is undisputed that, upon receipt of the M-858m form and following an evaluation of the applicant's E-HEAP eligibility, HEAP Central issues written notices to applicants of adverse E-HEAP

---

[7] POS has been fully implemented in all Job Centers. The POS program requires that Job Center workers conduct "electronic interview[s]" of individuals seeking public benefits, including emergency energy assistance. (Shepard Decl., ¶ 4.) Essentially, the program prompts Job Center workers to ask applicants a series of pre-programmed questions and to record the answers to each question by making electronic entries. (Id.) Depending on an applicant's responses, the program prompts the Job Center workers to ask additional questions or to take certain actions. (Id.)

[8] Job Center workers received training on these updates to the POS program in the month following when the updates were made. (Shephard Decl. II, ¶ 13.)

[9] The Court notes that, according to the City, future modifications to the POS computer program will eliminate the paper version of the M-858m form altogether as well as the need for the Utility Liaison to transfer the form to HEAP Central. (*See* Shephard Decl. II, ¶¶ 16-18; Shepherd Decl., ¶ 25.) It appears that the planned modifications will provide for an electronic version of the form to be automatically submitted to HEAP Central, and thus will eliminate the role of the Utility Liaison in the E-HEAP application process. (*See* Shephard Decl. ¶ 18.)

eligibility determinations. (*See* Pls.' July 14, 2006 Ltr., at 7 ("HEAP Central is the entity that issues E-HEAP notices."); Evans Aff., ¶¶ 30, 33-35 ("If an applicant is denied [E-HEAP benefits] due to ineligibility, the reason for the denial, and the applicant's right to a fair hearing to review the City defendant's determination are provided in the notice [issued by HEAP Central].").)

Plaintiffs have failed to undermine defendants' evidence regarding the adequacy of current E-HEAP notice procedures, or to respond with concrete particulars demonstrating that a triable issue of fact exists as to whether Job Center workers actually follow the City's current procedures. Instead, plaintiffs merely speculate that Utility Liaisons, and other Job Center workers, continue to make E-HEAP eligibility determinations without providing notice of adverse determinations.[10] (*See* Pls.' March

14, 2007 Ltr., at 2.) However, plaintiffs have failed to offer any evidence indicating that Job Center workers do not follow current City procedures and, in practice, deny E-HEAP benefits without referring applicants to HEAP Central. Thus, this Court finds that the risk of erroneous deprivation due to the City's notice procedures is extremely low and insubstantial.

(ii) Coding for Heater Households

Plaintiffs also argue that the City's Job Centers fail to ensure that households which pay for heat separately from their rent receive "fuel for heating allowances," and that such households, referred to as "heater households," are "properly computer-coded for potential E-HEAP eligibility." (Pls.' July 14, 2006 Ltr., at 3.) According to plaintiffs, this practice also constitutes a continuing violation of plaintiffs' due process rights.

The Court finds that the risk of erroneous deprivation due to the City's current procedures for identifying heater households is also extremely low. In so ruling, the Court relies on three Policy Directives issued by the City defendant and upon recent updates to the POS computer program that aim to properly identify and recognize heater households.

---

[10] In support, plaintiffs point to certain portions of the M-858m form and the City's Policy Directives, to wit: (1) a section of the M-858m form entitled "Utility Liaison Recommendation," which includes the question "Refer participant to HEAP?" and provides "Yes" and "No" check-boxes; and (2) portions of the City's Policy Directives charging Utility Liaisons with "determining if an applicant/participant should be referred to HEAP [Central]" and "completing the M-858m [form], including the 'Utility Liaison Recommendation' section." (Pls.' March 14, 2007 Ltr., at 2.) Yet, the portions of the record identified by plaintiffs do not support plaintiffs' speculative argument that Utility Liaisons continue to deny E-HEAP benefits without providing notice. Although the Policy Directives charge Utility Liaisons with "determining if an applicant/participant should be referred to HEAP [Central]" and with completing the "Utility Liaison Recommendation" section of the M-858m form (Fitzpatrick Decl., Ex. A; City Dft.'s Aug. 11, 2006 Ltr., Ex. A.), such decisions may be made by a Utility Liaison on the basis of factors

other than an applicant's E-HEAP eligibility – for example, if the applicant seeking public assistance benefits at the Job Center is not, in fact, attempting to obtain emergency *energy* assistance, or if the applicant has already applied for and received an E-HEAP grant to address the emergency at issue. In any case, as discussed herein, such speculative arguments fail to present concrete particulars that raise a genuine issue of material fact as to the City's current E-HEAP notice procedures, and fail to demonstrate that the risk of erroneous deprivation under current E-HEAP notice procedures is not extremely low.

Policy Directive # 01-72-ELI, dated December 7, 2001, provides that:

> [W]orkers in [] Job Centers must ensure that [HEAP] applicants/participants who pay for heat separately from their rent have a fuel allowance included in their public assistance grant. The correct heat type and code must be entered in the [state public benefits computer system]. This coding will also ensure that HEAP issues the correct amount [of benefits].

(Evans Aff., Ex. C.)

In addition, Policy Directive #06-06-ELI, dated April 4, 2006, provides that:

> Workers in [] Job Centers must ensure that applicants who have applied for public assistance . . . or participants who are in receipt of [public assistant] and who pay for heat separately from their rent have a fuel allowance included in their public assistance grant. The correct fuel type and shelter type code must be entered in the [state public benefits computer system]. This coding will also ensure that HEAP issues the correct amount [of benefits] in future.

(City Dft.'s Aug. 11, 2006 Ltr., Ex. A.)

Similarly, Policy Directive #06-32-ELI, dated November 28, 2006, provides that:

> Workers in the Job Centers must ensure that applicants for public assistance . . . or participants who pay for heat separately from their rent have a fuel allowance included in their public assistance grant. The correct

fuel type and shelter type code must be entered in the [state public benefits computer system]. This coding will also ensure that HEAP issues the correct amount [of benefits] in future.

(Fitzpatrick Decl., Ex. A (emphasis in original).)

Moreover, Policy Directive #06-32-ELI specifically instructs Job Center workers on how to indicate in the POS program that an individual applicant resides in a heater household. (*Id.*) These entries are used to complete the M-858m form, which is subsequently used by HEAP Central, along with other sources of information, to evaluate the household's eligibility for E-HEAP benefits.

In addition, on September 25, 2006, the City defendants issued "POS Release Notes" to Job Center workers that instructed them as to recent updates to the POS program. (Shephard Decl. II, Ex. B.) Among those updates, the program now requires Job Center workers to ask applicants if they pay for a "Heat Related Utility" separately from their rent. (*Id.*) A "Yes" answer to this question will indicate that the applicant in question pays for fuel to heat their home or apartment – that is, that the applicant resides in a heater household and is entitled to a fuel allowance. (*Id.*)

In response to this evidence, plaintiffs have failed to present any evidence that raises a question as to the efficacy of current procedures regarding the identification and proper coding of heater households at Job Centers. Instead, plaintiffs have done no more than offer speculation as to the "risk of human error" in the use of POS by Job Center staff. (Pls.' Aug. 4, 2006 Ltr., at 6.)

The Court therefore finds, because applicants now receive notice of adverse E-HEAP eligibility determinations and Job Centers now properly identify heater households, that the risk of erroneous deprivation due to the City's procedures for administering E-HEAP is extremely low and insubstantial.

## c. The Additional Procedures Requested by Plaintiffs and the Public Interest in Avoiding those Procedures

Finally, the Court considers the "public interest" in avoiding "the administrative burden and other societal costs," *Mathews*, 424 U.S. at 347, that would be imposed on the government "if the additional procedural safeguards sought by the plaintiffs are mandated." *Ford*, 87 F. Supp. 2d at 183 (citing *Mathews*, 424 U.S. at 335). As to the requested procedural safeguards, plaintiffs "ask[] this court to identify the legal deficiencies in existing municipal E-HEAP procedures and direct the governmental defendants to formulate a remedial plan (whether through computer modifications or personnel training or any other means) to cure those deficiencies." (Pls.' July 14, 2006 Ltr., at 2.) Because the Court found *supra* that defendants have cured the deficiencies in E-HEAP procedures identified by plaintiffs, this Court finds that the government has already assumed the burdens associated with the additional procedures sought by plaintiffs. As such, the value of imposing additional procedures would be insubstantial, if not redundant, and the public interest in avoiding the cost and administrative burden of such superfluous procedures is high.

Thus, upon balancing the *Mathews v. Eldridge* factors, this Court finds that existing E-HEAP procedures fully accord applicants due process. Although plaintiffs' have a substantial private interest in E-HEAP benefits, the risk of erroneous deprivation of that interest under the City's current procedures and the value of any additional procedures are extremely low and insubstantial, and the public interest in avoiding superfluous additional procedures is high. Accordingly, defendants' motion is granted as to plaintiffs' due process claims for prospective and those claims are dismissed. *See, e.g., Spinelli v. City of New York*, No. 02 Civ. 8967 (RCC), 2007 WL 766110, at *4 (S.D.N.Y. March 12, 2007) (granting summary judgment where "the risk of erroneous deprivation is insubstantial, and the government's interest is significant"); *Thomas v. Zaharek*, 289 F. Supp. 2d 167, 177-78 (D. Conn. 2003) (granting summary judgment where "there was not a substantial risk of erroneous deprivation" of an "important" private interest and the "probable value" of additional procedures "was insubstantial"); *Sussman v. N.Y.C. Health and Hosp. Corp.*, No. 94 Civ. 8461 (DBS), 1997 WL 334964, at * (S.D.N.Y. June 16, 1997) (granting summary judgment where "the risk of an erroneous deprivation of the [plaintiff's] private interests is too low, and the probable value of additional procedures too small"); *Leggio v. McGuire*, 552 F. Supp. 988, 990 (S.D.N.Y. 1982) (granting summary judgment where, although plaintiff "had a substantial interest" in the asserted property right, the risk of erroneous deprivation was "quite low").

## E. Eleventh Amendment Immunity

Since the commencement of this action, plaintiffs have significantly narrowed the scope of the relief sought against defendants. Plaintiffs now argue that they are entitled to certain relief necessary to remedy the alleged past procedural deficiencies of E-HEAP. (*See, e.g.*, Pls.' July 14, 2006 Ltr., at 2-4.) Specifically, plaintiffs seek declaratory, notice

and compensatory forms of relief against defendants for alleged past violations of state and federal law.[11] For the reasons that follow, the Court finds that the Eleventh Amendment prohibits plaintiffs from obtaining the retroactive relief sought against defendants.[12]

### 1. Immunity from Federal Claims

#### a. Legal Standard

The Eleventh Amendment "bar[s] federal suits against state governments by a state's own citizens." *Woods v. Rondout Valley Central Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (citing *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). Thus, in such suits, the Eleventh Amendment prohibits the award

---

[11] The Court found *supra* that plaintiffs' request for prospective injunctive relief must fail because the City's existing E-HEAP procedures do not constitute an ongoing violation of plaintiffs' rights under the Due Process Clause.

[12] Plaintiffs sue defendants in their official capacities as commissioners of state and city agencies, respectively. Official capacity suits are just another way of pleading a cause of action against the entity of which the officer is an agent. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). "Suits against state officials in their official capacity therefore should be treated as suits against the State." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Consequently, in interpreting Section 1983 to take into account state sovereign immunity provided by the Eleventh Amendment, the Supreme Court has plainly held that state officers are entitled to invoke the protections of the Eleventh Amendment afforded to the state. *See Hafer*, 502 U.S. at 26; *see also Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir.1993). Because the Court finds *infra* that both the State and City defendants are State officers, all defendants are entitled to invoke the protections of the Eleventh Amendment afforded to the State.

of injunctive relief, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 287-88 (2d Cir. 2003), compensatory relief, *Ward*, 207 F.3d at 119, and declaratory or "notice" relief against state officials "where there is no continuing violation [of a federal right] to enjoin," *Marbley v. Bane*, 57 F.3d 224, 232 (2d Cir. 1995), *abrogated on other grounds by Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Res.*, 532 U.S. 598 (2001). *See, e.g., Green v. Mansour*, 474 U.S. 64, 71 (1985). Thus, absent a continuing violation of federal law by the state, claims for injunctive, compensatory, or declaratory relief against state officials must be dismissed.

#### b. Application

##### (i) Declaratory and Notice Relief

Plaintiffs seek declaratory and notice relief informing class members of their right to challenge prior unlawful conduct by defendants. However, in the absence of a continuing violation of federal law, the Eleventh Amendment bars a federal court from awarding such declaratory and notice relief against a state defendant based on the state's past unlawful conduct. *Green*, 474 U.S. at 73. As the Supreme Court stated in *Green*:

> Because "notice relief" is not the type of remedy designed to prevent ongoing violations of federal law, the Eleventh Amendment limitation on the Art. III power of federal courts prevents them from ordering it as an independent form of relief. . . . [H]owever, a request for a limited notice order will escape the Eleventh Amendment bar if the notice is *ancillary* to the grant of some other appropriate relief that can be

"noticed." Because there is no continuing violation of federal law to enjoin in this case, an injunction is not available. Therefore, notice cannot be justified as a mere case-management device that is ancillary to a judgment awarding valid prospective relief.

474 U.S. at 71 (emphasis added).

This bar persists even where, as here, plaintiffs describe the requested relief as "prospective." In *Ward v. Thomas*, the Second Circuit denied declaratory and notice relief where the government had voluntarily modified its behavior to conform with federal law, even though plaintiffs had "framed their prayer for relief in prospective terms." 207 F.3d at 119 (noting that the plaintiff class had "endeavored to blur the distinction between prospective and retrospective relief by seeking both a declaratory judgment that the state had violated federal law in the past and 'notice relief' like that provided in *Quern* [v. *Jordan*, 440 U.S. 332 (1979)]"). The court found that the *effect* of the requested relief "would be entirely retrospective" because, among other things, the entry of a declaratory judgment, and its inevitable use in state court as *res judicata* on the issue of the state defendants' liability, would serve as a "full-fledged award of damages or restitution by the federal court." *Ward*, 207 F.3d at 119-120.

Similarly, here, plaintiffs seek declaratory and notice relief, and argue that any "'retroactive' corrective E-HEAP payments" that might result from such relief are not barred by the Eleventh Amendment because, pursuant to *Quern*, they are "ancillary" to the prospective injunctive relief sought by plaintiffs in this action. (Pls.' July 14, 2006 Ltr., at 8-11.) *See Quern*, 440 U.S. at 348 ("Whether a recipient of notice decides to take advantage of the available procedures is left completely to the discretion of that particular class member. . . . And whether or not the class member will receive retroactive benefits rests entirely with the State, its agencies, courts, and legislature, not with the federal court.").

However, given the absence of a continuing violation of federal law by defendants, see *supra*, the Court finds that the Eleventh Amendment bars the declaratory and notice relief sought by plaintiffs. As in *Ward*, a declaration in this case that defendants violated federal law *in the past* would, through its inevitable use in state court, effectively serve as a "full-fledged award of damages" – an outcome clearly prohibited by the Eleventh Amendment. *Ward*, 207 F.3d at 119-20; *see Marbley*, 57 F.3d at 232 ("After dismissal of [Plaintiff's] claims for prospective relief . . . , there was nothing left of [plaintiff's] case but a claim for retrospective declaratory judgment and an injunction. *Green* forbids such a declaration, and there is therefore no reason to entertain [plaintiff's] claim for injunctive relief."); *Kostok v. Thomas*, 105 F.3d 65, 69 (2d Cir. 1997) ("Any claim for retroactive monetary relief, under any name, is barred."); *Kapps*, 404 F.3d at 112 n.10 (noting that, in *Quern*, the Supreme Court "affirmed the appropriateness of awarding notice relief as *ancillary* to an otherwise appropriate grant of declaratory and injunctive relief against state actors") (emphasis added).

(ii) Corrective Payments

Plaintiffs also seek "corrective payments," in the form of an injunction ordering defendants to "release and distribute federal [HEAP] funds to . . . correct E-HEAP underpayments." (Pls.' July 14, 2006 Ltr., at 12.) Plaintiffs argue that such "corrective" payments are not barred by the Eleventh

Amendment because they would be drawn from E-HEAP funds provided by the federal government to the State, and thus no "state or local funds would be used . . . with respect to any retroactive corrective E-HEAP payments." (*Id.* at 11; *see* Pls.' Mem. in Opp. to State Dft.'s Mot. at 8.)

However, absent a continuing violation of federal law by defendants, the "corrective" payments sought by plaintiffs are barred by the Eleventh Amendment because they direct defendants to parcel out funds from the state treasury. *See Marbley*, 57 F.3d at 233; *Kostok*, 105 F.3d at 69 ("Any claim for retroactive monetary relief, under any name, is barred."). Specifically, the Court finds that the award of such relief would "interfere with the state's fiscal autonomy" by directing the State's use of funds under its control and by disrupting the State's ability to compensate presently eligible E-HEAP beneficiaries, "thereby implicating the Eleventh Amendment." *See Colbeth v. Wilson*, 554 F. Supp. 539, 545 (D. Vt. 1982), *aff'd*, 707 F.2d 57 (2d Cir. 1983) (quoting *United Carolina Bank v. Bd. of Regents of Stephen F. Austin State Univ.*, 665 F.2d 553, 560-611 (5th Cir. 1982) (noting that the Eleventh Amendment bars courts from directing the payment of "state-held funds, regardless of their source, or location, whenever payment would interfere with the state's fiscal autonomy")).

Moreover, the Second Circuit in *Marbley* did not view the fact that the E-HEAP funds originate with the federal government to alter the court's finding as to the Eleventh Amendment immunity of New York counties in administering HEAP. There, the court noted that, pursuant to LIHEAA, the federal government "provides block grants to participating states to subsidize part of the costs of heating . . . [and] New York has elected not to augment the federal subsidy with any state funds." *Marbley*, 57 F.3d at 227. In light of these facts, the court nevertheless concluded that, in administering HEAP, local social services commissioners "parcel out funds *from the state treasury.*" *Id.* at 233 (emphasis added). In this case, the same provisions considered in *Marbley* mandate that the State use funds under its control to reimburse any E-HEAP-related expenditures. N.Y. Soc. Serv. Law § 97(4) (mandating that all expenditures made by the City "pursuant to the federal low-income home energy assistance program . . . shall be subject to one hundred percent reimbursement by the state, if and for so long as federal funds are available for the full amount of such expenditures"). Thus, as did the court in *Marbley*, the Court finds that the judgment sought by plaintiffs, and any "corrective" payments that would result, would necessarily implicate the Eleventh Amendment.

### 2. Immunity from State Law Claims in Federal Court

### a. Legal Standard

The Eleventh Amendment also bars federal courts from granting relief against state officials for alleged violations of state law. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) ("The Eleventh Amendment bars federal suits against state officials on the basis of state law."). In *Pennhurst*, the Court observed that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." 465 U.S. at 106.

### b. Application

Here, plaintiffs allege violations of various provisions of New York State law relating to the distribution of E-HEAP benefits. Specifically, plaintiffs allege that the State is violating its own laws by failing to evaluate individuals' eligibility for E-HEAP benefits *before* providing other state-funded forms of emergency energy assistance, and by continuing to demand repayment of such state-funded loans improperly made to class members in lieu of E-HEAP benefits. (*See, e.g.,* Pls.' July 14, 2006 Ltr., at 3-4.)

However, "[i]n the interest of Federalism and as a matter of comity," this Court will not consider plaintiffs' state law claims. *Allen*, 100 F.3d at 260. Thus, even assuming *arguendo* that the State is violating its own laws by continuing to demand repayment of loans improperly made to plaintiffs in lieu of E-HEAP benefits, this Court is barred by the Eleventh Amendment from compelling the State to abide by its own laws. *Pennhurst*, 465 U.S. at 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.").

### 3. The City Defendant and Eleventh Amendment Immunity

### a. Legal Standard

The Second Circuit has observed that

The immunity recognized by the Eleventh Amendment extends beyond the states themselves to "state agents and state instrumentalities" that are, effectively, arms of a state. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *see also McGinty v. New*

*York*, 251 F.3d 84, 95 (2d Cir. 2001). It does not, however, extend to "suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State." *Alden v. Maine*, 527 U.S. [706, 756 (1999)]; *see also Board of Trustees v. Garrett*, 531 U.S. 356, 369 (2001).

*Woods*, 466 F.3d at 236; *see also N. Ins. Co. of N.Y. v. Chatham Cty., Ga.*, 126 S.Ct. 1689, 1693 (2006) ("A consequence of this Court's recognition of preratification sovereignty as the source of immunity from suit is that only States and arms of the State possess immunity from suits authorized by federal law."). Accordingly, in this case, the City defendant is entitled to Eleventh Amendment immunity only if it can demonstrate that, in administering E-HEAP, "it is more like an arm of the State, such as a state agency, than like a municipal corporation or other political subdivision." *Id.* at 236-37 ("[T]he governmental entity invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity.") (citation and quotations omitted).

Whether a local social services commissioner is acting as an arm of the state is "a case-by-case determination." *Housing Works, Inc. v. Turner*, 362 F. Supp.2d 434, 443 (S.D.N.Y. 2005). In making this determination, "[t]he appropriate analysis focuses both on the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity and on the degree of supervision exercised by the state over the defendant entity." *Pikulin v. City Univ. of New York*, 176 F.3d 598, 600 (2d Cir. 1999) (per curiam) (internal citations omitted); *see also* Wright, *supra*, § 3524 ("The central

22

factors in the final determination appear to be the degree of autonomy of the governmental entity and whether recovery against it would come from state funds; if the governmental unit simply is functioning as the alter ego of the state in accomplishing some public purpose, it will be treated as the state for purposes of the Eleventh Amendment.").

### b. Application

Guided by the Second Circuit's decision in *Marbley*, this Court finds that the City defendant acts as an arm of the state in administering E-HEAP, and is therefore entitled to the same protection that the Eleventh Amendment affords to the State. In *Marbley*, the Second Circuit found that two New York counties "act[ed] as arms of the state in administering HEAP," and were thus entitled to Eleventh Amendment immunity. *Id.* at 233. As such, the court held that the Eleventh Amendment barred plaintiffs from obtaining declaratory relief against the county defendants charged with administering HEAP. *Id.* at 232-33.

The reasoning of the Second Circuit in *Marbley* controls the "arm of the state" inquiry in this case. As the Second Circuit observed:

> The HEAP statute contemplates that the county social services districts will not be responsible for HEAP expenditures: any such expenditures are "subject to one hundred percent reimbursement by the state, if and for so long as federal funds are available for the full amount of such expenditures." N.Y. Soc. Serv. Law § 97(4). Moreover, the HEAP program only operates to the extent that federal funds are available: "No person . . . shall be certified as eligible for and

entitled to receive [benefits] . . . if no federal funds are available for such purpose." *Id.* at § 97(2). Given the counties' lack of policymaking discretion and the liability of the state for all county expenditures, the county defendants act as arms of the state in administering HEAP, and are therefore entitled to the same protection that the Eleventh Amendment affords to the state.

*Marbley*, 57 F.3d at 233.

In this case, plaintiffs attempt to distinguish *Marbley* by arguing that the instant case concerns the City defendant's alleged failure to *comply* with laws governing the distribution of E-HEAP benefits. By contrast, *Marbley* concerned the legality of a State HEAP regulation which was merely administered by the county defendants. Thus, plaintiffs argue, the "City [d]efendant's status herein is not that of a mere implementor of some objectionable HEAP-related statute or regulation, but rather as the prime violator of such provisions." (Pls.' Mem. in Opp. to City Def.'s Mot., at 38.)

The Court rejects plaintiffs' attempt to distinguish *Marbley*. The court in *Marbley* determined that individual social services districts acted as arms of the state in administering HEAP because (1) "social services districts will not be responsible for HEAP expenditures" necessary to satisfy the judgment requested by the plaintiffs but, rather, "such expenditures are subject to . . . reimbursement by the state," and (2) social services districts lack "policymaking discretion" in administering HEAP. *Marbley*, 57 F.3d at 233 (quotations omitted). The same reasons compel this Court to conclude that, notwithstanding the differing factual bases of *Marbley* and the instant case, the City

defendant acts as an arm of the state in administering E-HEAP.

First, New York law mandates that *all* expenditures made by the City defendant "pursuant to the federal low-income home energy assistance program, including the costs of administration, shall be subject to one hundred percent reimbursement by the state, if and for so long as federal funds are available for the full amount of such expenditures." N.Y. Soc. Serv. Law § 97(4). Thus, because the judgment sought by plaintiffs in this case would necessarily require the City to make expenditures pursuant to "the federal low-income home energy assistance program" (a program that encompasses E-HEAP), N.Y. Soc. Serv. Law § 97(4), the State "would be responsible for satisfying any judgment that might be entered against the [City] defendant." *Pikulin*, 176 F.3d at 600; *see Marbley*, 57 F.3d at 233.

Moreover, as discussed *supra*, the Court rejects plaintiffs' argument that, because the *original* source of E-HEAP funds is the federal block grant provided to the State pursuant to LIHEAA, the State would not actually be responsible for satisfying any judgment entered against the City. In *Marbley*, the Second Circuit did not consider the fact that the original source of HEAP funding was a federal block grant to be significant in conducting the arm of the state inquiry in that case. There, the court concluded that, in administering HEAP, local social services commissioners "parcel out funds *from the state treasury*." *Id.* at 233 (emphasis added). Similarly, in this case, State law provides that the State must use funds under its control to reimburse any E-HEAP expenditures made by the City defendant. Thus, as in *Marbley*, this Court finds that the judgment sought by plaintiffs would require the State to draw funds from its own treasury in order to reimburse the City for expenditures made pursuant to E-HEAP. *See Marbley*, 57 F.3d at 233.

Second, the Court finds that, in administering E-HEAP, the City defendant lacks policymaking discretion due to the close supervision of the State. New York State statutes and regulations establish the policies and procedures that the City defendants must follow in administering E-HEAP. *See, e.g.*, N.Y. Soc. Serv. L. § 97(2) ("Each social services districts *shall* be required . . . to participate in the federal low-income home energy assistance program and to assist eligible households found in such districts to obtain low-income home-energy assistance. . . . [T]hose persons who qualify for low-income home energy assistance . . . *shall be certified* as eligible for and *entitled* to receive said home energy assistance."); 18 NYCRR 393.4(d) (setting forth E-HEAP eligibility criteria). Moreover, defendants have demonstrated that the State defendant has closely supervised the City defendant's administration of the HEAP program, which includes E-HEAP. Specifically, defendants have presented facts demonstrating that, before and during the course of this litigation, the State has conducted HEAP monitoring reviews in the City, worked with the City in modifying the structure of the HEAP program, directed a review of the City's emergency assistance loan procedures in 1999 and 2000, corresponded with the City regarding the proper practices and procedures for HEAP, issued policy directives informing local social service districts of the opening of the HEAP season, and reviewed and had the opportunity to comment on new policy directives before they were issued by the City defendant. (*See* State Dft.'s Mem. in Opp., at 12; Velez Decl., Exs. F, H; Fitzpatrick Decl. ¶ 3.)

Thus, having reviewed the E-HEAP statutory framework and the evidence demonstrating the State's supervisory relationship with the City with regards to the City's administration of E-HEAP, the Court finds that the City defendant acts as an arm of the State in administering E-HEAP. *Marbley*, 57 F.3d at 233. As such, "[g]iven the [City's] lack of policymaking discretion and the liability of the [State] for all [of the City's E-HEAP] expenditures," the Court finds that the City defendant is entitled to the same protection that the Eleventh Amendment affords to the State in this case. *Id.*; *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48-49 (1994) ("[T]he 'vast majority of Circuits . . . have concluded that the state treasury factor is the most important factor to be considered . . . and, in practice, have generally accorded this factor dispositive weight.'")(collecting cases)(internal citations omitted); *Feeney v. Port Auth. Trans-Hudson Corp.*, 873 F.2d 628, 631 (2d Cir. 1989) ("In cases where doubt has existed as to the availability of Eleventh Amendment immunity, the Supreme Court has emphasized the exposure of the state treasury as a critical factor."), *aff'd on other grounds*, 495 U.S. 299 (1990).

## F. Equal Protection Claims

Plaintiffs failed to allege an equal protection claim in the first amended complaint. However, in their memoranda opposing defendants' motion, plaintiffs argue that the State defendant's conduct in administering E-HEAP "violates plaintiffs' right to equal protection." (Pls.' Mem. in Support ("Pl.'s Mem.") at 45.) "A party is not entitled to amend [their] complaint through [their] memoranda," and, therefore, the Court may decline to consider plaintiffs' equal protection claim on this basis alone. *Butvin v. DoubleClick, Inc.*, No. 99 Civ. 4727 (JFK),

2000 WL 827673, at *13 (S.D.N.Y. June 26, 2000) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (declining to address merits of claim that "does not appear anywhere in the amended complaint and did not enter the case until [the plaintiff] mentioned it for the first time in her opposition memoranda to the motion to dismiss"); *see, e.g., Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 765 n.4 (S.D.N.Y. 2006) ("[P]laintiffs cannot amend their complaint through a legal memorandum."); *Reading Intern., Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 318 n.9 (S.D.N.Y. 2003) ("Absent the filing of an amended complaint that properly pleads the components of [the asserted claim], the Court will not consider this allegation."); *Hernandez v. Wells*, No. 01 Civ. 4376 (MBM), 2003 WL 22771982, at *3 (S.D.N.Y. Nov. 24, 2003) (declining to consider claim not raised in complaint but argued in the parties' moving papers); *Farrell v. Child Welfare Admin.*, 77 F. Supp. 2d 329, 331 n. 4 (S.D.N.Y.1999) (same). Plaintiffs offer no explanation for their failure to amend the complaint to include an equal protection claim.

Nevertheless, even construing the amended complaint as containing an equal protection claim, such a claim must fail as a matter of law. Plaintiffs allege a form of selective enforcement: that the State defendant has "permitted the City Agency [DSS] to ignore" certain provisions of the E-HEAP statutory framework while enforcing such provisions elsewhere in New York State. (Pls.' Mem., at 44.) Specifically, plaintiffs assert that the State defendant has failed to correct the alleged procedural deficiencies of the City's E-HEAP program discussed *supra* while requiring other social service districts to adhere to the E-HEAP statutory framework, and that this selective treatment of E-HEAP applicants residing in New York City "bears

no rational relationship to a legitimate state objective." (*Id.* at 43.)

"To prove a selective enforcement claim, a plaintiff must demonstrate that laws were not applied to him as they were applied to similarly situated individuals and that the difference was intentional and unreasonable." *Deegan v. City of Ithaca*, 444 F.3d 135, 146 (2d Cir. 2006) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). In this case, as discussed *supra*, the Eleventh Amendment bars plaintiffs from obtaining anything other than prospective injunctive relief against defendants. Therefore, for plaintiffs' equal protection claims to survive defendants' motion, plaintiffs must identify some *ongoing* selective enforcement of the law by the State defendant. However, because the Court found *supra* that defendants have remedied the deficiencies in E-HEAP procedures identified by plaintiffs, and plaintiffs fail to present any evidence demonstrating that the State is currently allowing the City to deviate from the E-HEAP statutory framework or that such a deviation is actually occurring, the Court finds that no reasonable factfinder could conclude that the E-HEAP statutory framework is not being applied to plaintiffs as it is applied to similarly situated individuals elsewhere and that the difference is intentional and unreasonable. Thus, defendants' motion for summary judgment is granted as to plaintiffs' equal protection claim and that claim is dismissed.

### III. CONCLUSION

For the foregoing reasons, defendants' cross-motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied. Plaintiffs' claims are dismissed. The Clerk of the Court shall close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 27, 2007
Central Islip, NY

* * *

The attorney for plaintiffs is Peter Vollmer, Vollmer & Tanck, Jericho Atrium, 500 North Broadway, Suite 149, Jericho, New York 11753. The attorney for the State defendant is Andrew M. Cuomo, New York State Attorney General, by John P. Gasior, Assistant Attorney General, 120 Broadway, 24th Floor, New York, New York 10271. The attorney for the City defendant is Michael A. Cardozo, Corporation Counsel of the City of New York, by Jane Tobey Momo, Office of Corporation Counsel, 100 Church Street, New York, New York, 10007.