UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

№ 92-CV-1002 (JFB) (CLP)

———————

ROSELLA DUNN, ET. AL.,

Plaintiffs,

VERSUS

GREGORY KALADJIAN, ET. AL.,

Defendants.

———————

MEMORANDUM AND ORDER
September 28, 2011

———————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Geraldine Boyland, Joan and Robert Ford, and Phillis Scirica commenced this class action on behalf of themselves and other similarly situated New York City residents who sought the assistance of the New York City Department of Social Services ("DSS" or the "City") or one of its agents to resolve a heat-related energy emergency at any time since February 27, 1989 and (1) were not provided with an emergency benefit under the Home Energy Assistance Program ("E-HEAP") due to the failure of DSS or its agents to inform them of the availability of such benefits, or (2) did not receive timely notice of an E-HEAP eligibility determination or some form of assistance to resolve the energy emergency within forty-eight hours of the resident's request, or within eighteen hours if under life-threatening circumstances, or (3) received a state-funded loan pursuant to New York Social Services Law § 131-s to resolve the heat-related energy crisis without evaluation of eligibility for an E-HEAP benefit, and were compelled to repay such state funds. Plaintiffs sued both the City and the Commissioner of the Office of Temporary and Disability Assistance of the New York State Department of Family Assistance (the "State").

Plaintiffs have now moved pursuant to Federal Rule of Civil Procedure 60(b)(6) for relief from the Court's March 27, 2007 Order ("March Order") granting summary judgment in favor of defendants. Specifically, plaintiffs claim that defendants' procedures in implementing E-HEAP, which had been revised at the time of the March Order and

considered by the Court in its decision, have not resolved the lack of: (1) notice of E-HEAP determinations to applicants; and (2) proper coding of public assistance ("PA") households, which caused PA households to be unaware of their E-HEAP eligibility. For the reasons that follow, the motion for relief from judgment is denied. The Court concludes that plaintiffs have failed to satisfy any of the requirements necessary for a successful Rule 60(b)(6) motion.

I. BACKGROUND

The Court assumes familiarity with the facts and background of this case and with the statutory framework governing the distribution of HEAP and E-HEAP benefits in New York City, as discussed in the Court's March Order. The Court outlines below its decision in the March Order, as well as the newly discovered evidence upon which plaintiffs rely in support of their motion.

A. March Order

In its March Order granting summary judgment in favor of defendants, the Court concluded that: (1) the federal E-HEAP statute did not create a private right of action; (2) the current procedures employed by defendants in administering E-HEAP were constitutionally adequate and no continuing due process violation existed warranting prospective relief; and (3) any retroactive relief for past due process violations relating to E-HEAP were barred by the Eleventh Amendment. *Boyland v. Wing*, 487 F. Supp. 2d 161, 164 (E.D.N.Y. 2007).

The Court's ruling regarding defendants' procedures in administrating E-HEAP first addressed whether the Job Centers operated by the City failed to provide written notice of adverse E-HEAP eligibility determinations. *Id*. at 175. Plaintiffs alleged that Utility Liaisons at the Job Centers screened E-HEAP applications and solely passed on to HEAP Central, the body that was supposed to be making E-HEAP determinations, the applications that were considered eligible for the emergency grant. In the March Order, the Court concluded that plaintiffs failed to offer any evidence indicating that Job Center workers did not follow current City procedures and, in practice, denied E-HEAP benefits without referring applicants to HEAP Central. *Id*. at 177. The Court determined that defendants presented overwhelming evidence that applications for emergency energy assistance were forwarded to HEAP Central, which then provided notice of adverse E-HEAP eligibility determinations. *Id*. at 175. The Court evaluated the procedures implemented by defendants through their Policy Directives and Paperless Office System ("POS") computer program. First, the Court pointed to E-HEAP Policy Directives, whose provisions were buttressed by affidavits from City administrators, indicating that the Utility Liaisons at the Job Centers had to contact HEAP Central to initiate an E-HEAP application for any person requesting a heat-related grant. *Id*. at 176. Furthermore, the Court concluded that the defendants implemented policies and programs that assured that the Utility Liaisons were getting the E-HEAP applications. On this point, the Court concluded that Job Center workers who were directly speaking with applicants were filling out the form for energy assistance (the M-858m form (the "Form")) and passing the Form on to the Utility Liaison to initiate the E-HEAP grant application with HEAP Central. *Id*. Specifically, the Court concluded that the

2

POS program (1) allowed the Job Center employees to automatically populate relevant portions of the Form, and (2) provided an error message where the Form was not printed, reminding the Job Center employee to print the Form and forward it to a Utility Liaison or scan and index the completed Form. *Id.*

The March Order not only addressed the role of the Utility Liaison in providing notice of E-HEAP determinations, but also the coding issue raised by plaintiffs. The Court concluded that the risk of erroneous deprivation of due process due to the City's procedures for identifying PA "heater households," or households eligible for the E-HEAP emergency grant, was extremely low. *Id.* at 178. The Court once again pointed to the City's Policy Directives that instructed Job Center employees on how to indicate in the POS program that an individual applicant for public assistance resided in a household where heat was paid separately from the rent, which made the household eligible for E-HEAP benefits. *Id.*

In the March Order, the Court relied on the declaration of Michele Shepard, the Director of the POS, filed in support of defendants' motion for summary judgment. *Id.* at 176, 178 n. 9. In that declaration, she indicated that, by October 22, 2007, the POS program would "automatically, electronically transmit" the Form to HEAP Central. (Decl. of Peter Vollmer in Supp. of Mot. for Relief from Judgment dated Feb. 11, 2011 ("Vollmer Decl.") Ex. 3 ¶¶ 1, 17-18 (Supplemental Decl. of Michele Shepard dated Feb. 27, 2007).)

B. Newly Discovered Evidence

In support of their motion, plaintiffs rely on Policy Directives issued by defendants after the March Order, data on PA households receiving E-HEAP grants versus state-funded repayable loans since the March Order, as well as on the affidavit of Eugene Doyle ("Doyle"), a social worker licensed to practice in New York State. (Eugene Doyle Aff. Dated Feb. 11, 2011 ("Doyle Aff.") ¶ 2.)

On August 31, 2009, plaintiffs submitted to defendants a Freedom of Information Law ("FOIL") request demanding a database of: (1) all PA heater households who requested assistance to pay heat-related energy expenses since April 1, 2007, and received either an E-HEAP grant, a state-funded loan that was repayable, or a state-funded grant that was not repayable; and (2) the number of PA heater households during any given month covering the same time period regardless of whether they received any heat-related assistance. (Vollmer Decl. Ex. 13 at 2 (FOIL request).) On January 19, 2010, plaintiffs' counsel paid for the creation of said database. (*Id.* Ex. 14 at 3 (cashiers check from plaintiffs' counsel, dated January 19, 2010).) A computer disk containing the database was received by plaintiffs' counsel on July 27, 2010. (*Id.* Ex. 15.)

The information on the computer disk was analyzed by Doyle. The data indicated that 9,981 emergency energy payments were issued by the City to 1,450 PA heater households. (Doyle Aff. ¶ 86.) Of the 9,981 payments, 266 were E-HEAP grants and 6,331 were repayable state-funded loans. (Doyle Aff. ¶ 88.) Of the 1,450 PA heater households that faced a heating emergency, 166 received E-HEAP grants while 1,093 received the state-funded repayable loans. (Doyle Aff. ¶ 89.) Doyle further indicated that, in June 2007, .38% of

3

New York City's 186,002 PA households received a fuel-for-heating allowance, which is added on as an additional payment on top of public assistance normally received by PA households, while, in April 2010, .28% of the 184,064 PA households received that allowance. (Doyle Aff. ¶¶ 92-94, n. 59.)

In a FOIL submission dated December 3, 2009, plaintiffs requested from defendants E-HEAP policies issued after the March Order. (Vollmer Decl. Ex. 7 (the FOIL request).) On December 18, 2009, plaintiffs received defendants' response. (*Id.* Ex. 8.) Specifically, plaintiffs received four E-HEAP Policy Directives dated April 18, 2007, November 19, 2007, November 14, 2008, and December 11, 2009. (*Id.* Ex. 9-12.) Plaintiffs separately obtained the E-HEAP Policy Directive dated October 29, 2010 (*id.* Ex. 20), and November 18, 2010 (*id.* Ex. 26.)

As noted above, plaintiffs also rely on Doyle's affidavit apart from his data analysis. Doyle states that, based on his experience, "the chasm between the City Agency's declared E-HEAP policies and the street-level performance of the Job Centers has only continued to widen since this action was dismissed" in the Court's March Order. (Doyle Aff. ¶ 34.) In support of his conclusion, Doyle relies on: (1) a conversation that allegedly took place in December 2008 with a member of HEAP Central in which that member purportedly indicated that the Job Centers "do their own thing"; (2) an email exchange that took place in March 2009 with an Assistant General Counsel for the City in which he stated that "the [City] Agency does not track or long the information or data" regarding transmittal, receipt and actions taken with respect to the Forms; and (3) Doyle's experience with a client by the name of Brian Pedersen, who experienced problems with obtaining E-HEAP grants between March 2007 and March 2010. (*Id.* ¶¶ 35, 39, 45, 81-82.)

B. Procedural History

Plaintiffs filed their motion to set aside the March Order on February 13, 2011. The State defendant filed its opposition on July 20, 2011. The City defendant filed its opposition on July 20, 2011. Plaintiffs filed their reply on August 10, 2011. The Court has fully considered the submissions and arguments of the parties.

II. STANDARD OF REVIEW

"Federal Rule of Civil Procedure 60(b) governs motions for relief from a final judgment or order and provides six independent grounds for relief." *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298 (2d Cir. 2005). Rule 60(b) provides:

> On motion and upon just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . ., misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

4

Fed. R. Civ. P. 60(b).

The Second Circuit has instructed that Rule 60(b) is "extraordinary judicial relief" and can be granted "only upon a showing of exceptional circumstances." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). "The burden of proof is on the party seeking relief from judgment[.]" *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001).

Generally, "[f]or a Rule 60(b) motion to prevail, a three-part test must be met. First, there must be 'highly convincing' evidence supporting the motion. Second, the moving party must show good cause for failing to act sooner. Third, the moving party must show that granting the motion will not impose an undue hardship on the other party." *Hemric v. City of New York*, No. 96 Civ. 213(DLC), 2001 WL 118561, at *4 (E.D.N.Y. Feb. 13, 2001) (citing *Kotlicky v. U.S. Fidelity & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987)); Fed. R. Civ. P. 60(c)(1)("A motion under Rule 60(b) must be made within a reasonable time–and for reasons (1), (2), and (3), no more than a year after the entry of the judgment or order or the date of the proceeding."). *See also D'Angelo v. State Farm Fire & Cas. Co.*, 32 F. App'x 604, 605 (2d Cir. 2002) ("Material offered in support of a motion to vacate under Rule 60(b)(6) must be highly convincing material."); *Boehner v. Heise*, No. 03 Civ. 05453 (THK), 2009 WL 1360975, at *4-5 (S.D.N.Y. May 14, 2009) (applying the Rule 60(b) test to a motion for relief under Rule 60(b)(6)).

Moreover, the catch-all subsection 60(b)(6) "confers broad discretion on the trial court to grant relief when appropriate to accomplish justice [and] it constitutes a grand reservoir of equitable power to do justice in a particular case." *Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir. 1986), *cert denied*, 480 U.S. 908 (1987) (internal quotation marks and citations omitted). Relief under Rule 60(b)(6) is "properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship." *Matarese*, 801 F.2d at 106 (internal citations omitted); *see also Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004).

III. DISCUSSION

Plaintiffs bring their motion under Rule 60(b)(6), arguing that: (1) the performance data on the POS program for the years 2007-2009, in combination with defendants' Policy Directives, indicates that defendants have continued failing to provide notice of E-HEAP determinations and mislabeling PA households who would otherwise be eligible for E-HEAP benefits; (2) it took over three years for plaintiffs to gather the performance data; and (3) based on this newly discovered evidence, the March Order works an undue hardship on plaintiffs. (Pls.' Mot. at 3, 11-13, 19; Pls.' Reply at 8.) Defendants do not dispute that plaintiffs' motion should be analyzed under Rule 60(b)(6).[1] They argue, however, that: (1) plaintiffs' motion was not made within a reasonable time; (2) plaintiffs' motion was not supported by highly convincing evidence; and (3) that undue hardship would be imposed on defendants if the Court were to grant plaintiffs' motion. (City Def.'s Mot. at 4; State Def.'s Mot. at 7, 14-15.)

The Court agrees with defendants and denies plaintiffs' motion in its entirety. Specifically, the Court concludes that plaintiffs' motion does not present highly convincing evidence as to why plaintiffs should be relieved from the March Order, plaintiffs' motion was not made within a reasonable time, and granting relief in

---

[1] As a result, the Court treats plaintiffs' motion as properly made under Rule 60(b)(6).

5

plaintiffs' favor would work an unreasonable hardship on the defendants. Furthermore, plaintiffs have failed to demonstrate that they would either experience undue hardship if the March Order remained in effect or that extraordinary circumstances exist for setting aside the March Order.

A. "Highly Convincing Evidence" Requirement

Plaintiffs have not presented "highly convincing" evidence that warrants relief from the Court's March Order. Plaintiffs contend that the Utility Liaisons have continued to screen E-HEAP applications, solely passing along some applications to HEAP Central for an official E-HEAP determination and notice. (Pls.' Mot. at 11-13.) Plaintiffs also argue that defendants have continued to mislabel public assistance households by failing to provide them with a fuel-for-heating allowance, thereby causing these households to be bypassed from consideration for an E-HEAP grant.[2] (*Id.*) In support of their contentions, plaintiffs rely on: (1) Policy Directives issued by defendants since the March Order; and (2) a database of all PA households who requested any kind of heat-related assistance from defendants between April 1, 2007 through the end of 2009 (Vollmer Decl. Ex. 14 (letter outlining parameters of database). The Court concludes that this new evidence does not rise to the level of highly convincing and, in fact, largely reflects the very same information considered by the Court in the March Order.

1. Policy Directives

a. Screening by Utility Liaisons

Plaintiffs assert that, with each successive revision of defendants' Policy Directives, "Utility Liaisons retained the unilateral discretion to abort the E-HEAP application process by withholding the [Form] from HEAP Central when, in their judgment, the household was not E-HEAP eligible." (Pls.' Reply at 8.) The Policy Directives do not support plaintiffs' argument that the Utility Liaisons are taking on the role of HEAP Central. For example, the December 11, 2009 Directive ("2009 Directive") makes clear that, while the Utility Liaison continued to act as an intermediary between the Job Centers and HEAP Central, HEAP Central was responsible for determining E-HEAP eligibility. (Vollmer Decl. Ex. 12.) The 2009 Directive mandates that a Job Center worker must complete the Form for any

---

[2] Defendants appear to be under the impression that plaintiffs are also asserting a separate, new claim based on defendants' failure to pay a "fuel for heating" allowance and that such a claim cannot be properly considered on a Rule 60(b) motion. (State Def.'s Mot. at 17.) As plaintiffs themselves point out, they are simply arguing that they were not properly labeled as households where heat is paid separately from the rent, a by-product of which was their failure to receive a "fuel for heating" allowance and failure to be considered for E-HEAP benefits, for which they were automatically eligible by virtue of paying separately for heat. (Pls.' Mot. at 11-12.) As the Court noted in its March Order in considering this very same argument, the issue is one of "identifying heater households" that were eligible for E-HEAP. *Boyland*, 487 F. Supp. 2d at 178. In any event, as discussed *infra*, plaintiffs have failed to provide highly convincing evidence that they were being mislabeled. To the extent plaintiffs are trying to raise a new argument based on their not receiving a fuel-for-heating allowance, such an argument is not properly considered under a Rule 60(b) motion and may, instead, be brought as a claim in a new complaint.

6

applicant requesting heat-related assistance. (*Id*. at 4.) The Form must be signed and forwarded to the Utility Liaison (*id*.), who must proceed depending on the type of heat the requesting household is using. (*Id*. at 6.) For example, for households using natural gas, the Utility Liaison "must contact HEAP Central to initiate a HEAP application over the telephone." (*Id*.) For households using oil or kerosene, "the Utility Liaison must ensure, before contacting HEAP, that [the Form] confirms that the household has a participating oil vendor or has a non-participating oil vendor and: has a current service plan in place, or has a current budget plan with a cap price." (*Id*.) The Utility Liaison must then contact HEAP Central to initiate an E-HEAP grant application over the phone and must also fax a copy of the form to HEAP Central.[3] (*Id*. 6-7.) HEAP Central then makes a determination whether or not the application for E-HEAP benefits will be granted.[4] (*Id*. at 7.) The provisions in the October 29, 2010 Directive ("October 2010 Directive") and the November 18, 2010 Directive ("November 2010 Directive") regarding the role of the Utility Liaison mirror those in the 2009 Directive.[5] (Vollmer Decl. Ex. 20 at 4, 6-7 (October 2010 Directive); Ex. 26 at 4, 6-7 (November 2010 Directive).) Thus, the Policy Directives in no way

---

[3] The Policy Directives indicate that, when transmitting the Form to HEAP Central, the Utility Liaison should include a "[r]ecommendation" on the application whether an E-HEAP grant is warranted. (Vollmer Decl. Ex. 12 at 10 (2009 Directive); *Id*. Ex. 20 at 10 (October 2010 Directive); *Id*. Ex. 26 at 10 (November 2010 Directive).) However, that does not mean that the Utility Liaison can withhold some applications from HEAP Central based on his or her evaluation of the Form. The recommendation merely serves as an opinion that HEAP Central may or may not take into consideration.

[4] In his affidavit, Doyle suggests that HEAP Central is solely notifying applicants whose E-HEAP applications are granted but not those whose applications are denied. (Doyle Aff. ¶¶ 51-55.) In support of this argument, he points to the April 18, 2007 Policy Directive ("April 2007 Directive"), which is referred to in the November 2010 Directive "for more information on the Utility Process." (Vollmer Decl. Ex. 26 at 10.) As an initial matter, this argument is not raised by plaintiffs in their briefs. In any event, Doyle's argument is without merit. First, the Policy Directives are not geared towards HEAP Central and do not purport to outline all of its duties and specific functions. (*See, e.g. Id*. at 1 (November 2010 Directive is "for staff in Job Centers and Non Cash Assistance Food Stamp [] Centers."); *id*. Ex. 9 (April 2007 Directive is for "Utility Liaisons and all staff in the Job Centers.").) Second, the reference to the April 2007 Directive is specifically in a section of the November 2010 Directive outlining the responsibilities of the Utility Liaison, not HEAP Central. Finally, the November 2010 Directive itself says nothing of what procedures HEAP Central must take to provide notice to applicants.

[5] Plaintiffs further argue that there is no indication when the role of the Utility Liaison as an intermediary between the applicant and HEAP Central would be eliminated. (Pls.' Reply at 8.) Although it appears that the POS program was being utilized to fill out the Form, there is no indication in the Policy Directives that the Form could be electronically transmitted to HEAP Central without relying on the Utility Liaison to make a phone call and fax the Form to HEAP Central. However, the electronic transmission of the Form does not affect this Court's conclusion in the March Order that the Utility Liaison was not making the decision on E-HEAP eligibility. *Boyland*, 487 F. Supp. 2d at 176, n. 9. The Court's decision in the March Order was not contingent upon the POS being updated to electronically transmit the Form to HEAP Central without any involvement of a Utility Liaison. *Id*.

7

demonstrate that the Utility Liaisons were screening E-HEAP applications and solely forwarding some applications that were considered meritorious to HEAP Central.[6]

b. Labeling of PA households

As noted above, plaintiffs argue that the City failed to properly label PA households who paid for heating separately from their rent, thereby bypassing them from consideration for E-HEAP even though they were automatically eligible for it by virtue of paying separately for heat. (Pls.' Mot. at 11-13.) The Policy Directives do not support plaintiffs' argument that defendants are not properly labeling PA households. For example, the Policy Directives indicate that Job Center workers are required to use the POS electronic system when speaking with applicants and that the POS program prompts them to ask whether or not an applicant for assistance is paying for heat separately. Specifically, the 2009 Directive states:

> JOS/Workers must ensure that applicants for Cash Assistance (CA) or participants who pay for heat separately from their rent have fuel allowances included in their CA grants. The correct fuel type and shelter type code must be entered in the Welfare Management System []

---

[6] The Court notes that Doyle's affidavit seems to suggest that the policies in place are actually proper, but that the Job Centers resorted to entrenched procedures instead of following their agencies' new policies. (Doyle Aff. ¶ 34.) In any event, as discussed *infra*, there is no support in the data provided by plaintiffs that the Job Centers were not performing their function properly.

budget. This coding will also ensure that HEAP issues the correct amount in the future.

. . .

In order for the fuel allowance to generate in the CA budget through POS, users must:

\* click "Yes" in the Shelter (Housing) Expenses window for the question: Do You (Or Anyone Who Lives With You) Have a Heat Bill Separate From Your Rent Or Shelter Expense? Once "Yes" is clicked, a "Response to Question" drop-down window will appear: . . .

\* ensure that all information in the drop-down window is entered regarding the fuel type, account number, and company's name and address, and click on the OK button.

(Vollmer Decl. Ex. 12 at 6, 11.) The October 2010 Directive includes the same provision (*id*. Ex. 20 at 11-12), as does the November 2010 Directive (*id*. Ex. 26 at 11-12). In fact, the Court considered similar evidence from prior Policy Directives in its March Order and concluded that the risk of erroneous deprivation due to misidentifying PA households was extremely low. *Boyland*, 487 F. Supp. 2d at 178. Thus, there is no support in the Policy Directives for plaintiffs' argument that PA households are not properly labeled based on whether or not they paid for heat separately from their rent.

8

## 2. Database

### a. Screening by Utility Liaisons

Plaintiffs have wholly failed to link the greater number of state-funded loans over E-HEAP grants to conduct by the Utility Liaisons. Plaintiffs are essentially arguing that, looking at the database, defendants are issuing an overwhelming number of state-funded repayable loans, instead of E-HEAP grants. (Pl.'s Reply at 7-9; Supplemental Aff. of Eugene Doyle dated August 10, 2011 ("Supplemental Doyle Aff.") ¶¶ 30-50 (suggesting it takes less to qualify for an E-HEAP grant than a repayable state-funded loan.) However, plaintiffs are speculating on the cause of such a disparity.[7] In fact, plaintiffs themselves state that the disparity exists "for reasons unknown." (Pls.' Mot. at 19.) Even if the Court were to credit plaintiffs' analysis that the defendants are improperly giving state-funded loans instead of E-HEAP grants, it is unclear why that means the Utility Liaisons are making those determinations instead of HEAP Central. In other words, plaintiffs wholly fail to provide any evidence suggesting that the Utility Liaisons are making the allegedly improper determinations instead of HEAP Central. *See, e.g., Wolf v. Bd. of Educ. of the City of N.Y.*, 162 F. Supp. 2d 192, 203 (S.D.N.Y. 2001) (finding that plaintiff did not provide highly convincing evidence in support of her Rule 60(b)(2) motion her conclusion was "mere speculation"). Plaintiffs' arguments are focused on the substantive merits of the loan versus grant determination, rather than on the process that is owed to plaintiffs. In short, there is no highly convincing evidence from this data that any due process violations are taking place.

### b. Labeling of PA households

Plaintiffs also do not attempt to explain how exactly the database reflects mis-coding or mislabeling of PA households. As an initial matter, the database solely pertained to PA households who were receiving a fuel-for-heating allowance (Pls.' Reply at 5), and thus the database reflects information on households that were properly labeled.[8] In any event, the fact that more state-funded loans, as opposed to E-HEAP grants, are being issued does not mean that PA households are not being given a heat-for-fuel allowance, and are therefore bypassed from consideration for the E-HEAP grant. As noted above, the cause for the disparity in numbers is sheer speculation. Plaintiffs have failed to present any evidence whatsoever why this Court should deem the

---

[7] Defendants point to other reasons for the disparity. For example, the Court finds plausible defendants' arguments that more state-funded loans may have been issued because: (1) state-funded loans are not just limited to heating emergencies and may thus have been issued to cover applications not solely limited to a heat assistance request; (2) the E-HEAP program season may have closed by the time the applicant applied so that the applicant was only eligible for the state-funded loan; or (3) the applicant may not have satisfied all of the E-HEAP requirements, even if eligible. (State Def.'s Mot. at 10-11; *cf.* Doyle Supplemental Aff. ¶¶ 14-51.) Plaintiffs contend that defendants "cannot come up with a cogent alternative explanation" to their own for the disparity. (Pls.' Reply at 6.) However, the burden is on the plaintiffs, not defendants, to provide highly convincing evidence—a burden plaintiffs have failed to meet. *See infra*.

[8] As noted *supra*, all PA households who pay for heat separately from rent receive a fuel-for-heating allowance and are automatically eligible for an E-HEAP grant.

9

mislabeling of PA households the cause, even if partial, for the disparity. This is particularly true where the Policy Directives, discussed *supra*, demonstrate that defendants' policies were consistent with properly identifying and recognizing heater households.

\* \* \*

In sum, defendants' Policy Directives provide the same outline of the Utility Liaison's responsibilities and labeling procedures as the Policy Directives considered by this Court in the March Order. *See Boyland*, 487 F. Supp. 2d at 176-78. Furthermore, there is nothing in the database relied upon by plaintiffs to demonstrate that either the Utility Liaisons were improperly screening E-HEAP applications or that PA households eligible for E-HEAP were being mislabeled. Plaintiffs cannot use their motion as a vehicle to relitigate the merits of their case based on essentially the same facts already presented to the Court before the March Order. *See, e.g., Skinner v. Chapman*, 680 F. Supp. 2d 470, 479 (W.D.N.Y. 2010) (concluding that plaintiff failed to present any facts that bear upon the court's previous ruling and noting that a Rule 60(b) motion "cannot be used to relitigate the merits of a case")

B. Reasonableness of Delay

In addition to not providing highly convincing evidence, plaintiffs also waited for an unreasonable amount of time until February 13, 2011 to file their motion, almost four years after the Court granted summary judgment in favor defendants on March 27, 2007.

As an initial matter, it is unclear why plaintiffs had to wait for the completion of two E-HEAP cycles, for 2007-2008 and 2008-2009, before filing this motion. (Pl.'s Mot. at 6.) Plaintiffs contend that they were waiting for all POS program procedures to be fully implemented, but decided to proceed with this motion after the 2008-2009 cycle because the procedures still had not been fully implemented. (*Id.* at 6-7.) However, it is unclear why plaintiffs believed all procedures had not been implemented prior to even looking at the Policy Directives and database, which they did not request until 2009.[9] Furthermore, at the time of the March Order, plaintiffs knew that defendants expected to implement electronic transmission of the E-HEAP application by October 2007. Thus, even if the POS would not be fully implemented by October 2007, plaintiffs could have requested data and Policy Directives relating to E-HEAP performance by the defendants back in 2008 to see if they met their initial goal for electronic transmission. Plaintiffs made no such diligent effort and provide no explanation for why no such request was made beyond a conclusory assertion that the new procedures and POS program were not fully implemented by defendants.[10]

---

[9] Plaintiffs argue that they requested the database from defendants after receiving the Policy Directives, which allegedly indicated to them that the POS program was not fully implemented. (Pls.' Mot. at 7). In fact, however, plaintiffs requested the database in August 2009 prior to submitting a FOIL request for the Policy Directives in December 2009. *See supra*. In any event, even accepting plaintiffs' sequence of events, the Court finds the delay to be unreasonable.

[10] Even if plaintiffs needed to wait until 2009 to obtain the most accurate and up-to-date data, it is unclear why they submitted their FOIL requests for the PA household data and Policy Directives in August 2009 and December 2009, respectively, even though the E-HEAP application cycle ended

In any event, most of the evidence plaintiffs rely on in support of their motion was in their possession by December 18, 2009. At that time, plaintiffs received all of the requested Policy Directives, except for the 2009-2010 year,[11] which allegedly demonstrate that defendants used Utility Liaisons and perpetuated mis-coding in the same way as prior to the Court's March Order. In addition, the events relied upon in Doyle's affidavit took place in 2008 and early in 2009 so that by December 18, 2009, plaintiffs should have been aware of them had they been pursuing their claims diligently. Although plaintiffs had most of the information they used to file the pending motion by December 18, 2009, they waited until February 2011 to file their papers—more than one year later.[12]

In sum, the Court concludes that plaintiffs waited an unreasonable amount of time—approximately four years after the Court's March Order—to file this motion where: (1) they failed to provide a credible explanation for why they waited several years after the March Order was issued to request the Policy Directives and database; and (2) they failed to file the motion when in possession of most of the evidence they relied on in their briefs. *See, e.g., Kellogg v. Strack*, 269 F.3d 100, 104 (2d Cir. 2001) ("Kellogg's motion was made twenty-six months after the entry of the final judgment, a period of time which constitutes a patently unreasonable delay absent mitigating circumstances."); *Sonhouse v. Nynex Corp.*, No. 96 Civ. 3326 (DLC), 2000 WL 60204, at *2 (S.D.N.Y. Jan. 24, 2000), *aff'd*, 225 F.3d 646 (2d Cir. 2000) (court determined that a delay of over three years was unreasonably long for motion filed under Rule 60(b)(1) and (b)(6)); *Graham v. Sullivan*, No. 86 Civ. 163 (WK), 2002 U.S. Dist. LEXIS 9006, at *3-4 (S.D.N.Y. May 10, 2002) (delay of over nineteen months was unreasonable for a Rule 60(b)(6) motion).

### C. Undue Hardship

The Court also concludes that granting plaintiffs' motion would impose an undue hardship upon defendants. The complaint in this case was first filed in March 1992, more than nineteen years ago. The Court granted summary judgment in favor of defendants in March 2007, approximately four years ago. Plaintiffs have failed to show that having to re-litigate plaintiffs' complaint so long after the complaint was filed and dismissed would not impose an undue hardship on defendants. In a protracted litigation like this one, that spanned several decades, there is a strong interest in the finality of the Court's judgment.

---

in March. (Pls.' Mot. at 6.)

[11] Plaintiffs failed to articulate any reason why they absolutely needed the 2009-2010 Policy Directives where they already had in their possession multiple Policy Directives that allegedly perpetuated the role of the Utility Liaison as the arbiter of E-HEAP applications and the mis-coding issue raised by plaintiffs.

[12] Plaintiffs did not receive the database of PA heater households until July 27, 2010. As an initial matter, that data had nothing to do with the notice and coding issues raised by plaintiffs, so that plaintiffs did not need the database to file their motion. *See supra* Section III.A. In any event, plaintiffs waited an additional seven months after receiving this data to file the pending motion, even though by the time they received the database they had all the other information they now rely on in their motion.

### D. Extraordinary Circumstances or Undue Hardship on Plaintiffs

Finally, plaintiffs have not demonstrated that extraordinary circumstances necessitating relief from judgment exist or that the Court's refusal to grant such relief would cause undue hardship on the plaintiffs—either one of which would satisfy the requirements specific to Rule 60(b)(6).

Plaintiffs have failed to demonstrate that extraordinary circumstances exist for relief from judgment. Plaintiffs argue that they have presented extraordinary circumstances for relief where they are "without fault for [their] predicament and could not have undertaken any steps to prevent the judgment from which relief is sought." (Pls.' Mot. at 10.) However, extraordinary circumstances "typically do not exist where the applicant fails to move for relief promptly." *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 190 n. 8 (2d Cir. 2006). The Court concludes that plaintiffs should have acted sooner in filing their motion for relief from judgment. *See supra* Section III.B. Nor have plaintiffs demonstrated that they "would be left without a remedy if [their] motion were not granted[,]" which would qualify as an extraordinary circumstance. *LeBlanc v. Cleveland*, 248 F.3d 95, 101 (2d Cir. 2001). Plaintiffs have not indicated anywhere in their papers that they would be barred from filing a new complaint against defendants based on the evidence they are relying on in their motion.

Similarly, plaintiffs have not pointed to any concrete evidence of hardship that they have or will experience as a result of defendants' policies. *See supra* Section III.A. "The potentially unfavorable consequences that result from an adverse judgment properly arrived at do not, without more, constitute 'exceptional circumstances.'" *Chiulli v. I.R.S.*, No. 03 Civ. 6670(HBP), 2006 WL 3008084, at *3 (S.D.N.Y. Oct. 20, 2006) (citing *Atkinson v. Prudential Property Co.*, 43 F.3d 367, 373 (8th Cir. 1994)).

In addition, plaintiffs claim that justice demands relief from judgment based on counsel's failure to obtain attorney's fees. Specifically, plaintiffs argue that defendants "scrambled to initiate some form of corrective action" so as to avoid settlement and having to pay attorney's fees. (Pls.' Mot. at 24-25.) However, "[c]ounsel cannot demonstrate that vacatur is in the interest of justice, because Counsel cannot point to any error in the analysis or findings" in the March Order. *Trief v. Dun & Bradstreet Corp.*, No. 98 Civ. 1741 (DNE), 1994 WL 9781, at *3 (S.D.N.Y. Jan. 11, 1994). To the extent plaintiffs' counsel takes issue with the Supreme Court's decision in *Buckhannon Board and Care Home, Incorporated v. West Virginia Department of Health and Human Services*, 532 U.S. 598 (2001), because plaintiffs cannot get attorney's fees unless there is an order, judgment or consent decree in plaintiff's favor even if the ultimate goals of the litigation are achieved (Vollmer Decl. ¶¶ 62-81), plaintiffs' disagreement with this binding Supreme Court precedent is obviously not a basis for relief under Rule 60(b)(6).

\* \* \*

In sum, plaintiffs have failed to satisfy any of the requirements for a successful Rule 60(b)(6) motion, and have not demonstrated extraordinary circumstances or an undue hardship that would warrant such relief.

12

## IV. CONCLUSION

For the reasons set forth above, plaintiffs' motion for relief from judgment is denied.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 28, 2011
Central Islip, NY

\* \* \*

The attorney for plaintiffs is Peter Vollmer, Vollmer & Tanck, Jericho Atrium, 500 North Broadway, Suite 149, Jericho, New York 11753. The attorney for the State defendant is Eric T. Schneiderman, New York State Attorney General, by Vincent Leong, Assistant Attorney General, 120 Broadway, 24th Floor, New York, New York 10271. The attorney for the City defendant is Michael A. Cardozo, Corporation Counsel of the City of New York, by David A. Rosinus, Jr., Office of Corporation Counsel, 100 Church Street, New York, New York, 10007.